## J. D. ADAMS v. THE STATE.

*No. 1153.    Decided December 18th, 1895.*

**1.  Jurisdiction—Greer County—Judicial Cognizance.**

On a trial for murder, where a plea in abatement to the jurisdiction of the court was interposed, upon the ground that Greer County was not within the territory of the State of Texas. Held: Greer County has been recognized as an integral part of Texas by general legislation of this State; and this court takes judicial cognizance that it is a part of the State of Texas.

### 2. Change of Venue—Bill of Exceptions Must Contain Evidence as to.

Under Art. 621, [584] Code Crim. Proc., the ruling of the court in granting or refusing a change of venue, cannot be revised on appeal, unless the facts upon which the ruling is based are presented in a bill of exceptions prepared, signed, approved and filed at the term of the court at which such order was made.

### 3. Murder—Charge—Self-Defense—Manslaughter.

On a trial for murder, where there was evidence showing that in a sudden quarrel deceased made the first demonstration as if to draw a weapon, whereupon defendant drew and fired the first shot, which was a fatal one. Held: That a charge of the court which instructed fully upon defendant's right of self-defense as to this matter, was sufficient, and a charge upon manslaughter was not called for.

### 4. Same.

On a trial for murder, where the evidence showed that defendant coolly, deliberately and avowedly sought deceased, with the intention expressed of killing him if the deceased questioned his conduct in regard to a certain matter—defendant being armed, deceased not—and deceased did question his conduct, as he had a right to do: the proof being conclusive that defendant was there for the purpose of killing, and did kill, deceased. Held: That, under such state of case, the court was not required to charge upon self-defense and much less manslaughter, even though deceased may have been the first to make demonstrations as if to draw a weapon.

### 5. Same—Qualification of Jurors—Formed Opinion.

Where jurors upon their voir dire examination, as to qualification, state, that their formed opinion as to the guilt or innocence of defendant is from rumor and hearsay, and that notwithstanding such opinion, they would give defendant a fair and impartial trial on the evidence in the case. Held: They are competent jurors. Following, Suit v. State, 30 Tex. Crim. App., 310.

### 6. Special Venire—Talesmen.

In summoning the jurors under the original writ of special venire, where the sheriff, without any authority, of his own motion summoned a number of talesmen, who were not brought forward on the special venire, and afterwards, when ordered to summon talesmen, after the regular venire was exhausted, the sheriff brought in some of these original talesmen summoned by him without authority. Held: No reversible error is shown, there being no suggestion of any corrupt motive on the part of the sheriff in the matter.

### 7. Same—Summoning Talesmen—Swearing Sheriff.

Where a sheriff has been once sworn with reference to summoning talesmen, it is not necessary that he should be re-sworn when ordered to summon other new talesmen.

### 8. Same—Serving Defendant With Copy of the Special Venire.

Where the defendant was served with a copy of the special venire on Saturday, and he was brought to trial on the following Monday. Held: The statute allowing him one entire days' service of the venire before trial, was complied with.

### 9. Same—Evidence.

On a trial for murder, where a physician examined the wounds in the deceased's body, it is not error to reject the testimony of a witness who was present, and proposed to testify, that the physician said, that what looked to the witness like stringy blood, was threads of the clothing which had been carried into the wound by the ball which had gone in there: and especially so where the physician testified in person, that he took pieces of the clothing out of the wound.

### 10. Same—Confession—Evidence of Acts of Defendant While in Arrest.

On a trial for murder, where the State was permitted to prove, by the sheriff, that while defendant was in jail defendant had executed a note and mortgage upon horses: and, it was objected that the evidence was inadmissible, because defendant was in jail and had not been warned. Held, That the execution of the note and mortgage was not a confession, but, that if it could be so considered, the evidence showed that a day or so previously, defendant had been duly warned by the sheriff, and this warning was sufficient to justify the admission of the evidence.

**11. Same—Bill of Exceptions to Evidence Excluded on Cross-Examination.**

A bill of exceptions taken to the exclusion of the testimony of a witness on cross-examination, to be sufficient must disclose what the witness would have testified.

APPEAL from the District Court of Greer.  Tried below before Hon. G. A. BROWN.

This appeal is from a conviction for murder in the second degree, the punishment assessed being a term of ninety-nine years' imprisonment in the penitentiary.

A motion for change of venue was made by defendant, which was overruled; but, the bill of exceptions to the ruling having failed to set forth the evidence adduced upon the motion, is not considered by the court, and is therefore elimiated from the case.

Defendant moved to continue the case, on the ground of threats of mob violence, excitement and prejudice, which motion was also overruled.

One Horatio Thomas had been separately indicted for this same murder.  He turned State's evidence, and testified on the trial of this appellant.  The leading facts are shown by the testimony of this witness, which is here reproduced.

Horatio Thomas being introduced as a witness for the State, the District Attorney admitted that he was under a separate indictment, charging him with the same offense for which defendant is on trial, the court then warned him that he could not be forced to testify, and also that any statement that he might make would be used as evidence against him; the witness then replied that he would willingly testify as a witness in the case, whereupon he testified as follows:  "My name is Horatio Thomas.  I know defendant, J. D. Adams.  I knew the deceased, Mack Muse, very slightly.  Never saw him but once, and never spoke to him.  On the 22nd day of August, the date of the death of Mack Muse, the defendant, J. D. Adams, and I ate dinner at my father's, E. R. Thomas, house together.  After dinner we, defendant and I, went over to Ross Omara's, where defendant lived.  I rode behind defendant on the same mare with him.  After we reached Omara's I caught another large bay mare, which belonged to the defendant, and went over to Mr. McCreary's to borrow a saddle to ride, and then came back to Omara's, where I had left the defendant.  The defendant and I then got on the mares, both of which belonged to the defendant.  I rode the large bay mare and defendant rode the small bay mare, and from Omara's we went east to see about a thresher.  After we had got a mile southeast of Omara's, J. D. Adams, the defendant, saw Mr. Ringer's cattle and said that he would drive off a red yearling, which belonged to Ringer, and kill it, as it had been getting in the field.  We drove it around south of the break and west of Omara's house, and Adams was trying to rope the yearling, and had thrown the rope at it two or three times, and it had caught on the yoke of the yearling.  He said he intended to cut the yoke off the yearling.  He got off his mare and caught the yearling, and when I reached

him he had the rope and yoke off the yearling and the yearling was loose, and he picked up the yoke and handed it to me, and told me to take it up on top of the hill and throw it down, which I did." Witness here identified the yoke shown him in court as the one referred to, and which witness, J. R. Byers, also identified. "After I dropped the yoke on the hill, I then rode back to Adams, defendant, where he was driving the yearling on in a little pasture back of Omara's. About that time Adams and I saw Mack Muse down at the point of the break, and about one-half or three-fourths of a mile off, and Mack Muse was driving a cow and a calf. When Mack Muse saw us, he turned his horse and came toward us in a lope, and went up on the hill where I had left the yoke. Then Mack Muse turned and rode to the southwest corner of the pasture; that is, the pasture west of Omara's, and which Adams and I were then in, and in which was the cottonwood tree. Mack Muse then turned and rode back to the hollow on the south side of the pasture, then he turned and looked at us and rode off across the bridge and into another hollow and we thought he had gone. Adams and I then got on our horses and rode over east toward Omara's, and when we got up on top of the hill we looked and saw Mack Muse, and Adams said he thought it was him. Mack Muse looked like he was coming back. Adams said he would go down and meet him, and we turned and rode toward Mack Muse and we rode down under the hill, and I told defendant that I believed Mack Muse was gone, and defendant said he would go a little further and see, and we rode on a little piece further and saw Mack Muse coming towards us around the point of a break or hill, and defendant said he thought it was Mack Muse and I asked him (defendant) what he was going to do and defendant said he was going to kill him (Mack Muse) if he said anything, he looked mad when he said it. I told him that he had better not, as it would stick us both. Adams and I then rode on a little further toward Mack Muse and Mack Muse was still coming on meeting us. Adams here said he thought it was Henry Hoover and again said it was Mack Muse. I then asked him again what he was going to do and defendant looked mad and again said that he was going to kill him if he said anything. I then told him again that he had better not. Adams rode on up, facing Mack Muse, and I stopped about twenty steps before I reached Mack Muse, and defendant rode up to Mack Muse and they spoke to each other, and Mack Muse asked defendant whose yearling he (defendant) was getting off with and defendant told him no one's. Then one or the other passed the lie, I don't know which one. Mack Muse then put his hand behind him and then defendant shot him in the breast with a 44-caliber Colt's pistol. Mack Muse then turned to the left and ran and Adams immediately whirled his horse and ran after deceased, continuing to shoot after him. Mack Muse was in his shirt sleeves and had on a vest, and I saw the blood on his shirt as he ran. Adams told me after the shooting that he shot five times while they were running, and while defendant was shooting at Mack Muse they ran to the right of me about

ten or fifteen steps. They were then running in a northeast course, and after they had passed about seventy-five yards I thought that Mack Muse would get away and we both would be stuck for it. I then turned after them and about seventy-five yards behind Mack Muse I shot at him. Muse and Adams were still running and Adams shooting at him. Adams shot just at the time I did, when I fired the first shot. At the time Adams was about ten steps from Mack Muse and was a little to the rear and left of Mack Muse. At that time my right arm had been broken and I could not use it and I shot with my left hand. I am right-handed and cannot shoot as well with my left hand as I can with my right. Mack Muse began falling from his horse about the time Adams and I both shot at the same time. I was about seventy-five yards behind him when I shot first. After Mack Muse fell from his horse defendant called me and said, "Come and shoot him again," and I ran by him on my horse and shot at him and missed him. I know that I missed him because I saw the dust fly up just about a foot from his head. My horse ran about twenty or thirty yards to where defendant was and I whirled around and defendant told me to go back and shoot him again, and I went back to Mack Muse again and shot him in the head. I saw Mack Muse jump or jerk when I shot him through the head, and I knew by this that he was dead. Defendant and I then rode off to the west, and as we started off defendant asked me if I was sure that I had hit him, and I told him yes. We then rode on west to the Stripe pasture, nearly to the fence, about one-fourth mile from the gate, and then went up to the gate and went inside the pasture. I told him several times as we went on, that we were in it, and defendant told me that he could not help it, and that he (defendant) would not have done it if Mack Muse had not been a Ringer man and if deceased had not been working against him. Defendant said he would never have gone down to where Mack Muse was, if Mack Muse had not been a Ringer man. Mr. Ringer and defendant had been on bad terms, and Mr. Ringer had shot defendant once this year, and Mack Muse was a friend to Mr. Ringer. After we went into the pasture defendant and I went to the right of the road over the ridge into another hollow, and then went down the hollow near the creek, and then turned and went back to the pasture gate and came out the gate and went toward my father's (E. R. Thomas') house, nearly to the southwest corner of his place, and then we turned east to Omara's place, and defendant got off his horse about 250 yards from Omara's house, and went to the house, and said he was going to see Mrs. Omara, and told me that if Mr. Omara was gone that he could get Mrs. Omara to testify for us. Defendant also said that Mrs. Omara had told him that if he ever got into trouble with Ringer and killed him, that she (Mrs. Omara) would swear him out of it. When Adams went up to Mrs. Omara's house he took both our pistols with him, because my pistol had three cartridges in it and his pistol only had one, and he said he might meet the officers and he wanted to be ready for them. I saw and heard Adams and Mrs. Omara talking out in the yard. I then rode up close

to the house, and defendant and Mrs. Omara came up close to where I was. Mrs. Omara asked me, in the presence of defendant, what was the matter, and I told her that we had killed Mack Muse, and wanted her to swear that we were at her house at the time of the killing. I don't recollect her reply, but think she said all right. I then told her that she had better swear that we were going along just in sight and in front of her house and going toward Mrs. McCreary's at the time of the shooting, and also that she heard the shooting, and she said she would. Defendant was present during all the conversation, and heard all that was said. Defendant and I then rode off from the house, and both of us went to my father's house and we both stayed there that night. As we went on from the dead body of Mack Muse, defendant told me not to throw the empty shells in my pistol away, but for me to put them in my pocket. On the night of the killing, defendant and I slept in a wagon in my father's yard, and the next morning the defendant told me to clean up my pistol, and he cleaned up his in the wagon where defendant and I slept. The next morning after the killing, the defendant told me that he would go over and see Mrs. Omara, to see if everything was all right, and he left soon after breakfast and went in the direction of Mrs. Omara's. Defendant came back to where I was in the afternoon, and said he had seen Mrs. Omara, and that everything would be all right. Just as defendant had finished telling me what Mrs. Omara had said, he looked up and said, 'Yonder comes some fellows now,' and he then rode off. The parties he saw coming toward us were officers coming to arrest us." (Here witness was shown two pistols. He recognized one as a 44-caliber Colt's pistol, which defendant had on at the time of the killing, and with which defendant shot Mack Muse, and the witness also recognized the other pistol as a 45-caliber Colt's, which he [witness] was wearing at the time of the killing of Mack Muse, and with which he [witness] did the shooting. Here State introduced pistols in evidence.) "When Rich Thomas was arrested he was riding the same bay mare I was riding the day before, and at the time of the killing, and when defendant was arrested he was riding the same bay mare which he was riding the day before, and at the time of the killing. I asked defendant if we had better not trim our horses' feet, and he said no, that it would look too suspicious. This occurred in Greer County, Texas, on the 22nd day of August, 1893, about one hour and a half by sun-down. I was riding the big-footed mare in the middle track, as shown by S. C. Vanleer's plat. If deceased had any firearms I did not see them. The deceased ran about 200 yards after the first shot was fired before he fell. His hat fell off fifty or sixty yards before deceased fell. Defendant did the shooting with a 44-caliber Colt's pistol, which he told me had been cut off by Mr. Hurst, who resides in this county, and who is in attendance upon this court as a witness in this cause. The 44-caliber. Colt's pistol shown witness looks exactly like Adams' pistol, and looked like it had been cut off. The County Attorney told me he would let me out of this trouble entirely if I would testify as a witness, and tell all I knew about

it, which I agreed to do, and did so on the examining trial. The District Attorney would not stand by this agreement, but has agreed with me that he would dismiss my case to murder in the first degree and permit me to plead guilty to murder in the second degree if I would turn State's evidence and tell all I knew about this case, and it is partially for this purpose that I now testify. I shot deceased because I knew we would both be convicted. I am now 17 years of age. I never told Mrs. Omara that I killed Mack Muse. I never told her that I killed him in self-defense. As I was led into it by defendant, I thought if I could get out of it by turning State's evidence I would do so. I read part of my testimony given on the examining trial this morning. I wanted to read it over. I did not call for it. It was brought to me, and I kept it for half an hour. I did insult Mrs. Ringer some time before the killing of deceased. I had some improper talk with her, but she did not seem to be insulted, but I heard that Mr. Ringer had carried a gun for me. When my brother, Rick Thomas, was arrested on the day after the killing he had on my pistol with which I did the shooting. I had reloaded the three which I shot at deceased. I shot only three times."

E. R. Thomas, his father, was placed on the stand to corroborate what his son had sworn to. His testimony was as follows:

E. R. Thomas, for the State: "I am the father of Horatio and Rick Thomas. Defendant rode a little bay mare and Horatio rode a large bay mare, both of which belonged to defendant. I suppose these were the horses they rode, as the horses were there next morning. I could not see the horses until next morning, because they came in about 11 o'clock at night. They slept in the wagon. The next morning I saw a pistol in the wagon. I do not know whose pistol it was, as I paid no attention to it. I found in the wagon, after defendant was arrested, a 44-caliber cartridge hull, and here it is." (Exhibits it is court.) "The next morning I heard defendant ask my son, Rick Thomas, for some 44 cartridges. Rick told defendant that they were in his gun and he would give them to him after they left the house. They then rode off together and defendant was gone a little while and came to the field where I was plowing, and Horatio asked defendant if he had got that thing fixed, and defendant said yes. I heard Horatio and defendant mention Mrs. Omara's name, but could not tell what they said. I went around to the head of my team and heard them talking about going off to pick cotton. Defendant asked where Rick was and Horatio told him that he had gone to the burial of deceased, and defendant said he ought not to have gone."

Cross-examined: "I told Mr. Tittle, sheriff, on the next day after the killing that Horatio and defendant came to my house the afternoon of the killing an hour and a half by sun, and that I had Horatio's pistol and shot it off at a rabbit before they came home. I was lying to Mr. Tittle, but I am telling the truth now. Rick Thomas is gone and I do not know where he is."

Re-examined: "I lied to Mr. Tittle to mislead him and throw him off his guard. I did not know the boys had done the killing at that time."

S. H. Tittle, sheriff of Greer County, testified for the State: "I examined the pistol Rick Thomas had when arrested. It was a 45-caliber Colt's pistol, this is the one. It had three cankered cartridges in it and three not cankered. After defendant was in jail I cautioned him that anything he said might be used against him. It was after I had cautioned him he told me he was riding the little bay mare the day of the killing. I don't know whether it was the same day I cautioned him or the next day after I cautioned him he told me he was riding the little bay mare the day of the killing. The little mare referred to by defendant was the one he was riding when arrested and the one I had when Vanleer and Blocker and others examined tracks and feet." Cross-examined by defendant: "I told defendant what he said might be used against him. I asked him a great many questions. I don't remember what all I did ask him. The horses spoken of by Vanleer and Blocker were J. D. Adams' horses. He mortgaged them after his arrest, and I had seen him riding and using them a great many times. When Adams was arrested his pistol had been recently shot and had been partially cleaned up, but I ran a white handkerchief through the barrel and found fresh burned powder. I have handled pistols many years and can tell when one is recently shot."

Dr. A. D. Lewis testified for defendant: "I am a practicing physician, and have been for five years. I examined the deceased and found four wounds in the body and one in his clothes. The ball through the body went in from the rear and came out in front, a little piece of skin was torn out in front, and strings from the clothing were carried into the wound in the rear by the ball, in the examination of which I used a magnifying glass."

Cross-examined: "I pulled several threads out of the wound in the back. The hole through the body was larger in front than behind. In front the hole was torn; behind it was a smooth, round hole. I made the examination about 10 o'clock A. M., at the request of the Justice of the Peace, who held the inquest. The hole in the head was made from behind. I pulled hair out of it from behind. I cannot tell how a bullet entered in cloth after the cloth has been exposed to moisture, because it shrinks and draws up. A man lying on his face on the wet ground, as deceased was, the front part of the vest would draw up and make the hole appear smaller. I examined the book and a letter in the vest pocket; the ball tore the edge of an envelope and pushed it out in front. I live in Bell County, and was here on a visit at the time. I do not know defendant, and did not know deceased. I have no interest whatever in either of them. Any one of the wounds in the body were mortal."

Amongst other instructions, defendant requested the court to instruct the jury as follows:

The defendant requested the court to charge the jury "That, if they

believed from the evidence under the charge of the court that defendant did make an attack on deceased, and that at the time he began such attack it was justifiable in self-defense, as explained in the charge, and should further believe that deceased attempted to abandon the conflict, and that defendant, after he had so attempted to abandon the conflict, pursued him and killed him, and that such act of defendant in pursuing deceased was clearly in excess of his necessary self-defense, and that defendant, at the time he so pursued the deceased, was acting under the immediate influence of sudden passion—that is, any of the emotions of the mind known as anger, rage, resentment or terror, which rendered his mind incapable of cool reflection—and that such passion was produced in the mind of defendant by the conflict with deceased, and that such conflict would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection, defendant would be guilty of no higher grade of offense than manslaughter."

This instruction was refused by the court, and is the one discussed in the opinion below.

*Farrar, Kincaid & Williams*, filed a most able and interesting brief for appellant; and, after the affirmance of the judgment, by the opinion below, also filed a motion for rehearing, which was supported by an able brief, in which they contended: "That where the testimony adduced on a motion for change of venue is embraced in full in the record on appeal, it is not required, in order to entitle it to consideration, that it should also be contained in the separate bill of exceptions reserved to the ruling of the court in overruling the motion to change the venue;" and cited, in support of this proposition, rules 55 and 59, of the Supreme Court, 84 Texas, p. 716; Code Crim. Proc., Art. 686; Rev. Stats., Arts. 1359 to 1363, inclusive.

2. The court erred in holding, that the bill of exceptions reserved to the testimony of the witness, Thomas, on cross-examination, which was excluded by the court, does not disclose what the witness, Thomas, would have testified. And so, failing in this, the exception taken cannot avail appellant. The rule invoked by the court, and the authorities cited in support of the ruling, have no reference to the cross-examination of a witness, but are directed wholly to the examination in chief, of one's own witness. "When a question is proper, no matter what the answer might be, its exclusion will be considered on appeal, though the bill of exceptions fails to show the expected answer." Brown v. Wilson, Tex. Civ. App., 29 S. W. Rep., 530; 1 Thomson on Trials, §§ 425, 680; Harness v. State, 57 Ind., 1; Highland v. Milner, 96 Ind., 308; Martin v. Elden, 32 Ohio Stat., 282.

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, Presiding Judge.—Appellant was convicted of murder in the second degree and given 99 years in the penitentiary. Appellant filed

a plea to the jurisdiction of the court in effect alleging that the homicide occurred in Greer County, and that the courts of this State have no jurisdiction over offenses committed therein. Greer County has been recognized as an integral part of the State of Texas by general legislation of this State, and this court takes judicial cognizance that it is a part of this State, and the plea to the jurisdiction was properly overruled on this ground. Moreover, appellant's bill of exceptions does not show what facts it proposed to prove in order to establish that Greer County was not a part of the State of Texas, and, in the absence of such facts offered to be proved, the court did not err in overruling the motion. The transcript contains 160 pages, the evidence upon the motion for a change of venue covering 12 pages thereof. The motion being overruled, appellant excepted, reserving his bill of exceptions. The bill of exceptions does not contain the evidence in support of and against the motion to change the venue. Article 584 of the Code of Criminal Procedure provides; "The order of the judge granting or refusing a change of venue shall not be revised upon appeal unless the facts upon which the same was based are presented in the bill of exceptions, prepared, signed, approved and filed at the term of the court at which such order was made." This law requires the evidence upon which the order refusing to change the venue of a cause is based to be inserted in a bill of exceptions, properly approved, and filed at the term of the court at which such order was made. The facts upon which the order refusing the motion to change the venue were based are not in a bill of exceptions, and therefore we cannot consider them. Blackwell v. State, 29 Tex. Crim. App., 194; Smith v. State, 31 Tex. Crim. Rep., 14; Lacy v. State, 30 Tex. Crim. App., 119; Miller v. State, 31 Tex. Crim. Rep., 609. There is nothing in appellant's motion to continue this cause on the grounds alleged by him, of excitement and prejudice then existing against him in Greer County. Miller v. State, 32 Tex. Crim. Rep., 319; Id., 31 Tex. Crim. Rep., 609.

There are a great many special instructions requested by appellant and rejected by the court. We have considered them all carefully in connection with the charge given by the court. We have not time to discuss these requested instructions, but we believe the charge of the court, as given, applied the law to every phase of the case presented by the evidence. One requested charge, however, will be noticed. Counsel for appellant seem to think that the following theory of the case was presented by some testimony; that is, that appellant may have been justified in the first shot, and, as the deceased abandoned the difficulty, and was on the retreat, and appellant and his accomplice, Horatio Thomas, shot him afterwards, when neither of them was in any danger, that, therefore, manslaughter was presented. We do not so view the case. That the first shot was a fatal shot is positively shown, and nowhere denied. The court charged fully and liberally the law of self-defense, applying it directly to what was done by the deceased at the time of the first shot, so that, if the jury should believe certain evidence,

they should acquit the defendant of all guilt in the first shot. This is not a case in which the appellant may have been justified in the first shot, but culpable in the subsequent shots. It is not a case in which he shot at and missed the deceased, or a case in which he shot and inflicted a wound which was not mortal, and the deceased abandoned the difficulty, and defendant repeated the shots when he was in no danger, but a case in which a mortal wound was inflicted by the first shot. Now, the court instructs the jury, if they believe this shot was fired under certain circumstances, to acquit the defendant. This is all to which he was entitled, if in fact, he was entitled to any charge on self-defense. We are of the opinion, however, that there was neither self-defense nor manslaughter in this case. There is no testimony remotely presenting self-defense or manslaughter, but a case in which appellant coolly, deliberately, and avowedly sought the deceased with the intention expressed of killing him if he questioned his conduct in regard to a certain yearling. Appellant was armed; the deceased was not. The deceased did question his conduct in regard to the yearling; had a right to question it. Appellant was armed, and ready to execute his threat; and, whether the deceased threw his hand to his pocket or not, the proof is conclusive that appellant was there for the purpose of killing him, and did kill him. Under this state of case the court was not required to charge on self-defense, and hence was not required to charge upon manslaughter resulting from the conduct of the deceased in putting his hand behind him, because, whether the conduct of appellant made it necessary for the deceased to resort to arms, yet the appellant's intention was to kill him if he mentioned the subject pertaining to the yearling. By reference to the record it will be seen that appellant had taken the yoke from a certain yearling belonging to one Ringer, with whom he was at enmity, and was driving said yearling. The deceased, who was a Ringer man, "as the case has it," witnessed these facts, and when they met mentioned the subject to appellant. Appellant was driving the yearling off to kill for the purpose of injuring Ringer, if not to steal the same. When the appellant saw deceased, and recognized him, he stated that he intended to kill him—repeating the statement—if he mentioned the yearling. Appellant went to where the deceased was armed with a pistol, and when the deceased did mention the subject of the yearling he shot him, inflicting a deadly wound upon him. We can find no self-defense nor manslaughter in such a case.

Appellant challenged a number of jurors for cause, which were overruled, and he saved his bill of exceptions. The answers of said jurors, in connection with the qualification of the court to the bill of exceptions, show that those of said jurors as had formed any opinion in the case had done so, not from having heard any witness state the facts, but from rumor and hearsay; and they further declare that, notwithstanding any opinion then entertained as to the guilt or innocence of appellant, they could give the appellant a fair and impartial trial on the evidence in the case. Under the rule laid down in the case of Suit v. State, 30 Tex.

Crim. App., 319, the jurors so challenged by appellant were competent, and the court did not err in overruling said challenges.

It appears from the bill of exceptions that the sheriff summoned the original venire, and also a number of jurors, as talesmen. This he had no right to do, nor were they brought forward on the special venire; but it appears that when the sheriff was ordered to summon talesmen he brought in some of these same jurors who had been originally summoned by him, though not on the special venire. There was no suggestion in this action of any corrupt motive on the part of the sheriff in originally summoning these men, and we see no error in the sheriff's summoning and bringing them into court when he was authorized to summon talesmen on the exhaustion of the special venire. Nor was there any error in the refusal of the court to have the sheriff re-sworn to summon the talesmen, as he had been previously sworn in that regard. There is nothing in appellant's objection to being placed on trial for want of service of a true copy of the indictment in the case. The first copy served, it appears, was not a true copy; but another was served on the same day, and within the time required by law, before he was brought to trial. With reference to service of the special venire, he was served on Saturday, the 7th inst., and on the following Monday he was brought to trial. This was in accordance with the statute allowing him one entire day's service of the venire before his case should be tried.

Appellant assigns as error the refusal of the court to permit him to prove by the witness Byers that he (Byers) was present when Dr. Lewis examined the wound through the body of the deceased, and that he took out of said wound what looked to witness like stringy blood; and that Dr. Lewis said at the time that it was thread from the clothing of deceased, which had been carried into the wound by the ball. In the explanation of the court to this bill of exceptions it is shown that the witness, Dr. Lewis, was present, and under the rule. This appears to us to be hearsay testimony; but, concede that it was not, the record shows that he was subsequently examined, and that he testified that he took the pieces of thread from the clothing out of the wound of the deceased. Inasmuch as said witness was present and examined on this point, there was no error in rejecting the testimony.

The appellant also assigns as error that the court permitted S. H. Tittle, the sheriff, to testify that on Saturday, while appellant was in jail under this charge, he gave a note and mortgage to secure it with a bill of sale on the two horses spoken of by the witnesses, Blocker and Vanleer. The appellant claims that this testimony was not admissible, because at the time he was in jail, and had not been duly warned by the sheriff. As we understand it, this was not a confession, but appears to have been an independent act of appellant, executed in the course of a business transaction. The mortgage itself, if not executed under some further duress than the mere fact of being in jail, was such a contract as appellant was authorized to make. It was authorized to go to record,

and could have been introduced as evidence in this case. No objection was made, as we understand it, to the character of the testimony as being parol when the writing should have been produced. But, concede that the execution of this note and mortgage on the horses was in the nature of a confession, yet the evidence shows that within a day or two previous the appellant had been duly warned by the sheriff. Maddox v. State., 41 Texas, 205.

Appellant also assigns as error that he asked the witness, Thomas, on cross-examination, when on the stand, if he (Thomas) had not run off before the shooting of Mack Muse, to avoid a prosecution for insulting Ringer's wife. The object sought was to show that Thomas, who engaged in the shooting with appellant, had animosity against Ringer, and, as deceased was a Ringer man, also had animosity against him. The bill of exceptions, however, does not disclose what the witness, Thomas, would have testified, and so, failing in this, the exception taken cannot avail appellant. Buchanan v. State, 24 Tex. Crim. App., 195; Walker v. State, 19 Tex. Crim. App., 176. This judgment is affirmed.

*Affirmed.*