FRED SAWYER v. THE STATE.

No. 1879. Decided November 2, 1898.

**1. Jury Law—Special Venire—Absent Jurors.**

On the call of the special venire two of the veniremen were absent. The defendant declined to ask attachments for them, and upon motion of the county attorney attachments were issued. The court ordered the impanelment of the jury to proceed without awaiting the appearance of said absentees, and defendant excepted. Before the panel selected was finally completed, both the absentees appeared and both were excused, being exempt by reason of overage. Held, no error is shown and no injury to defendant.

**2. Qualification of Juror—Opinion Formed—Bill of Exceptions.**

A bill of exceptions reserved to the qualification of a juror who on voir dire examination states that he has a formed opinion as to the guilt or innocence of the defendant, should state the answers of the juror, or the fact or information upon which the juror may have based the opinion, or the reasons why the court held him qualified.

**3. Same—Qualification of Juror—Opinion Formed.**

On voir dire examination to disqualify a juror on account of an opinion formed as to the guilt or innocence of the defendant, such opinion must a fixed one—that is, established. If formed from mere idle rumors or newspaper accounts, or matters of that sort, and it is not established or fixed, the juror is not incompetent.

**4. Same—Where Juror Has Been Peremptorily Challenged.**

Where it appeared that the jurors stated their formed opinion was not a fixed one and would not influence them in arriving at their verdict, and that they could give defendant a fair and impartial trial, and the court held them qualified, whereupon defendant excepted and peremptorily challenged said jurors, and said jurors did not sit upon the trial, and it is not shown that any other obnoxious juror was impaneled, Held, no error is made to appear.

**5. Same—Rape—Conscientious Scruples Against Death Penalty—Practice.**

On a trial for rape, where a juror, on his voir dire examination stated that he had conscientious scruples against the infliction of the death penalty, "except in extreme cases of murder in the first degree," but left it in doubt as to whether he had such scruples in a rape case, whereupon the court, on suggestion of the county attorney that he was disqualified, excused the juror, and defendant excepted; Held, the court did not err, it being impossible for the court to know that the juror was qualified, and it being the duty of the State to furnish only qualified jurors.

**6. Continuance—Bill of Exceptions—Practice on Appeal.**

Unless a bill of exceptions is reserved to the action of the court in refusing or overruling an application for continuance or postponement of a case, such matter will not be revised on appeal.

**7. Conduct of Trial—Applause of Argument by Audience.**

A mere statement in the motion for a new trial that the audience applauded the closing argument for the prosecution, not accompanied by a bill of exceptions, nor in any way by affidavit or otherwise verified or shown to be true, can not be considered on appeal.

**8.  Rape—Evidence Sufficient.**

See opinion for facts summarized which the court hold amply sufficient to support a judgment of conviction for rape with the penalty assessed at death.

APPEAL from the District Court of Ellis.    Tried below before Hon. J. E. DILLARD.

Appeal from a conviction for rape; penalty, death.

The indictment charged the appellant with the rape of Fannie Fuller, on or about the 5th day of June, 1898.

' The opinion of the court below gives a very full and clear summary of the important facts developed on the trial, and no additional statement is called for.    Nor do any of the supposed errors complained of by appellant and discussed in the opinion need further illustration.

*W. M. McKnight, W. P. Hancock,* and *J. E. Justice,* for appellant. [No brief for appellant found with the record.—Reporter.]

*Lee Hawkins,* County Attorney of Ellis County, and *Mann Trice,* Assistant Attorney-General, for the State, filed an able brief and argument.

DAVIDSON, JUDGE.—Appellant was convicted of rape, and his punishment assessed at death; hence this appeal.

The first bill of exceptions recites that, during the call of the special venire, it was ascertained that T. H. Williamson and J. M. Gillpen, whose names had been drawn upon said special venire, were absent.    The court ordered that the impanelment of the jury proceed without waiting for the appearance and examination of said jurors, to which defendant excepted.    The bill further recites "that the county attorney asked defendant if he desired attachments for said veniremen.    Defendant did not request attachments, but said they waived no rights.    It was then that the county attorney requested attachments for said veniremen." Before the venire had been exhausted, Williamson appeared and claimed his exemption by reason of being over age, and was excused.    The special venire was exhausted, and talesmen summoned.    Pending the examination of the talesmen, Gillpen appeared, and claimed exemption by reason of his over-age, and was also excused.    The bill of exceptions states no reason or objection to this action of the court.    No error was committed by the court in this regard, and it is not shown or claimed that appellant suffered any injury thereby.    See Hudson v. State, 28 Texas Crim. App., 323; Habel v. State, 28 Texas Crim. App., 588.

The second bill of exceptions discloses that three jurors, McDuffy, Jenkins, and Graves, stated upon their voir dire examination that they had formed an opinion as to the guilt or innocence of the defendant, and, if taken as jurors, they would go into the jury box with this opinion in their minds, and that it would take evidence to remove it.    Whereupon the court asked each of said veniremen if that opinion was a fixed opinion; and they answered that it was not fixed, and, in answer to further

inquiry, stated that said opinion would not influence them in arriving at their verdict, and that they could give defendant a fair and impartial trial. Whereupon the court held they were qualified. Appellant excepted to the ruling of the court, and peremptorily challenged each of said jurors. So it would seem that these jurors did not sit in the case. Nor is it shown anywhere in the record that a juror obnoxious to appellant was impaneled. It will be observed that the means by which the jurors arrived at a conclusion or formed an opinion is not shown; only conclusions were stated. Doubtless, if the bill had stated the answers of the jurors, it would have been shown that the opinion was formed from mere idle rumors or hearsay. At least, the bill fails to show the fact or information upon which the jurors may have based an opinion, or the reasons why the court held them qualified. The burden is upon the objecting party to show the error of the court; and, unless this has been done, it is a legal presumption that the court acted properly. See Aud v. State, 36 Texas Crim. Rep., 76; Post v. State, 10 Texas Crim. App., 579. It is further stated in the bill that this opinion was not fixed; that is, established. Before the juror is incompetent, this must be ascertained. If it is a mere loose opinion, formed from idle rumors or newspaper accounts or matters of that sort, and is not established or fixed as to the guilt or innocence of the accused, the juror would not be incompetent. The statute requires that there must be established in the mind of the juror such a conclusion as would likely influence him in finding the verdict, before he would be incompetent. So, in this regard the court committed no error. See Suit v. State, 30 Texas Crim. App., 319; Adams v. State, 35 Texas Crim. Rep., 285; Trotter v. State, 37 Texas Crim. Rep., 468. And, in addition, the jurors did not sit in the case; and, in so far as they are concerned, there was no question as to the fairness or impartiality of the jury. It was not contended that, because these jurors may have had an opinion, therefore the jurors who tried this case did.

A bill of exceptions was reserved to the action of the court holding M. A. Bairy disqualified as a juror, on the ground that he had conscientious scruples in regard to the infliction of the death penalty in capital cases. The bill states the circumstances as follows: "The juror was asked by the county attorney 'if he had any conscientious scruples in regard to the infliction of death as a punishment for crime.' The juror answered that he had, except in extreme cases of murder in the first degree. The county attorney explained that this was a case of rape, and stated to said juror that he was to be the judge as to whether or not this is an extreme case. The juror stated he did not know whether or not this is an extreme case. On being asked by the county attorney if he had conscientious scruples as in a case of this kind, the juror answered he did not know whether he had or not,—could not make up his mind on that. The county attorney stated to the court that he thought the juror had disqualified. Whereupon the court excused said juror, to which defendant excepted." If the juror has conscientious scruples in regard to the infliction of the death penalty, the State has the right to challenge

him for cause in a case where a capital crime is under investigation. If this were not true, the State would be compelled to take jurors in capital cases who had conscientious scruples in regard to inflicting the death penalty, unless the defendant saw proper to exercise his challenge for such cause. This is not the intention or meaning of the law. The rights of the parties are largely the same with reference to challenges for cause. If the defendant alone had the right to challenge on this ground, then this construction of the law would render inoperative the punishment of death for crime in Texas. It would be a rare instance in which the defendant would excuse a man who had conscientious scruples in regard to the infliction of the death penalty, when he was on trial for a capital offense. It is the duty of the State to furnish a juror qualified to sit in the trial of the case. If the juror himself on his voir dire leaves his qualification in doubt, the court can not be certain that he is a qualified juror; and in such case, when the challenge is made by either party (when both have the equal right to challenge), it may be the duty of the court to excuse the juror. Especially is this the case when there is no request by either party to further examine the juror as to his qualifications. But in this case the juror himself stated that he had conscientious scruples in regard to the infliction of the death penalty, except in extreme cases of murder in the first degree. His attention was called to the fact that this was a case of rape, not of murder; and he was then asked if in such a case he had any conscientious scruples. He replied that he did not know whether he had or not. In such case it was impossible for the court to know that the juror was qualified, and, on challenge being made at this stage, he did not err in allowing the challenge.

It is contended that the court erred in overruling the motion for a postponement or continuance of the cause. As no bill of exceptions was reserved, this action of the court can not be revised.

There is nothing in appellant's motion to quash the indictment. It is in accord with the well approved forms in such cases.

The fifth ground of the motion for a new trial alleges that, when the assistant county attorney had closed the opening argument for the State, the audience in the gallery applauded, which appellant avers can be considered only as an expression of an indorsement of the views and suggestions advanced by said assistant county attorney "in crying for the defendant's blood," and thus giving to the jury an indication as to the feeling and excitement on the part of the audience against the defendant. This is presented simply as a ground of the motion for a new trial, and in no way verified or shown to be true. No bill of exceptions was reserved, and it is not shown by affidavit or otherwise that there was any applause or excitement manifested by the audience. As this matter is presented, we can not consider it.

This disposes of the questions raised by appellant, except the last, which is that the verdict of the jury is not supported by the evidence. The issues made by the defendant were—First, if the prosecutrix was raped, that the State's proof failed to identify him as the guilty per-

petrator; second, conceding that defendant was sufficiently identified, then the State's proof failed to establish beyond a reasonable doubt that she did not consent to the act of carnal intercourse,—in other words, that the force proved was not sufficient.

As to the first proposition, the evidence of the prosecutrix (if she is to be believed), in connection with the surrounding circumstances, settles beyond controversy the identity of the appellant as being the person who came to her room on the night in question. Appellant denied this, and testified to an alibi; but her evidence on the question of identity was positive, and it was the province of the jury to credit her, and discredit him. It is urged on the part of appellant that conceding as true the circumstances attending the alleged rape, as shown by the evidence of the prosecutrix, it is not established beyond a reasonable doubt that she did not consent to the act of copulation. In this connection it is insisted that the circumstances narrated by the prosecutrix show that, at the time of the alleged rape, she was in a room adjoining a room occupied by King and his wife, and that the least outcry on her part would have brought them to her assistance; that her child 8 years old was sleeping by her side, and that a slight disturbance would have awakened the child; that consequently there must have been no resistance or scuffle on the bed that would indicate any degree of resistance. Moreover, it is urged that, from her own testimony, she must have consented to the act, as she narrates a conversation had with the defendant, and acts and conduct on her part inconsistent with the fact that she offered any resistance; and, in addition to this, that after the outrage, which occurred about 3 o'clock at night, she remained in her room the remainder of the night, making no outcry or disclosure of the offense until the next morning, when it was reasonably within her power to have informed others of the offense long before that time.

The facts as stated by the prosecutrix show that she slept in the room in the rear of the sample room, which was connected with her room by a door, and adjoining the room of the prosecutrix was another room, in which King and his wife usually slept; that she retired to her room about 11 o'clock; that her bed was situated near the back of the room, next to the wall; that her boy, 8 years old, slept in front, and she slept behind, next to the wall. About 3 o'clock she was aroused from her slumber by some one standing over her. She says: "When I awoke and saw him over me, he gave me my orders. I threw up my hands before me, and he told me to be quiet or he would kill me and my child. After that he grabbed my hands. At this time he was right down over me, and I tried to keep him away with my feet. I tried to move over near my little boy to wake him. Sawyer told me I had better not wake that child. When I would try to move over towards the child he would pull me back. He grabbed me in different ways,—first one way and then another. Every time I tried to move towards the child, he would tell me I had better not wake that child, that he would kill us both. He remained in the room

39th Crim. Rep.—36

about fifteen or twenty minutes. It seemed like a long time to me, but I suppose it was not longer than that. * * * I remarked, 'Oh, my God! if I had not left my window open' (thinking he came in there). I said, if I had fastened the window he would not have been there. And he said he did not come through the window, but came through the door. The wardrobe was against the door between the two bedrooms. He tried to make me kiss him, but I would not. He had been in there some minutes at that time. When I told him I would not kiss him, he said he would make me kiss him. He asked me why I would not kiss him, if it was because he was a negro. I told him I would not kiss any man. He told me what he was going to do, and offered me money,—five, ten, and twenty dollars. I told him, 'No, not for the world;' that I was a poor woman, but I did not make my living that way. He said I had just as well consent, that he was going to, anyway. During the time he was in there he used good language, and seemed to be finely educated. I judged so by the way he talked. I recollect some of the expressions he used. He asked me if I knew what the penalty would be for the crime he had committed, if it should be found out. I did not answer at first, not wanting him to know that I knew; and I finally told him that I did not know that I did know. I was afraid to tell him that I knew. He said he would be hanged. That was after he had accomplished his purpose. He said he had a wife and two children, and told me it would be quite a favor to him to never give it away; that he would not tell it. He made me swear twenty times, I suppose, not to tell it. He said he would kill me if I did not swear. I know it was that negro there [looking at defendant] who was in my room that night. It was about 3 o'clock Sunday morning. I fix the time by hearing a clock strike somewhere about the building just after he left the room. He went into the sample room, and stayed in there the remainder of the night. I heard him in there from that time on until he left. I heard him or somebody; it sounded like he was on the planks, and was turning over. I heard that noise continually after he went out of my room until morning. I was sitting up on the foot of my bed all the time the noise was going on. I never laid down any more after he went out; and the reason I did not go out and give the alarm was because he said he would kill me if I left, and would also kill my child. I went out of my room about daylight; went out of the window, and across to the first room of the main building [which was about thirty feet distant from her room]." The planks referred to by prosecutrix in the sample room were those that were laid from one bench to another for the purpose of placing or exhibiting the samples of the drummers. Mrs. King, the proprietress of the hotel, occupied the room to which the witness went early in the morning. She reported the matter to Mrs. King, who was in bed at the time. Prosecutrix further testified that, when she first discovered the negro in the room, she tried to halloo, but he gave her her orders, that he would kill her if she did. She tried to talk loud, but he would jerk and check her, and would not allow her to talk except in a low whisper. When she would undertake to talk

loud, he would check her, and say he would kill her, and frequently put his hand over her mouth. She said that she did not know positively that anyone occupied the adjoining room at the time; that ordinarily Mr. Ed. King and his wife slept there. Ed. King was the son of the proprietress. In this connection, the testimony shows that she had been at the hotel only one or two days previous, having come from Kaufman to become an employe at the hotel. She was weak and sore across the back and other places, some of which she hated to mention, and, at the time she testified, there were still bruises on her limbs. The pain she suffered was caused by being jerked around by defendant and worrying with him while she was struggling with him. She further stated, as to the act of copulation: "I tried to protect myself with one hand, and fight him with the other. He tried to make me take away the hand I was protecting myself with, but I would not; and he jerked it away, and got on top of me, and did what he wanted to do." It was further shown by Mrs. King that prosecutrix exhibited her person to her on that morning, and that she was bruised about the neck, shoulders, hips, and limbs. This was about daylight. The matter was immediately reported by Mrs. King to her husband. He went at once from the main building to the sample room to see defendant. He found him there, engaged in unpacking certain trunks of his employer, Hyman, who was a drummer; appellant having come there with him as his porter the day before. This witness states that appellant was busy unpacking the samples, and appeared so cool and collected that he thought there must be some mistake about it, and immediately went back to see his wife; and, having seen her again, he at once returned to the front of the building, being absent only a few minutes, but saw appellant at that time going from the direction of the hotel towards the depot of the Houston & Texas Central Railway, which was situated about 250 feet from the hotel. He followed appellant there and saw him buy a railroad ticket, and then went to get a policeman to arrest defendant. Before he returned, the train had pulled out, and defendant was gone. This was 7 o'clock in the morning. Appellant was arrested on a telegram to the conductor; the telegram being received by him at Hutchins, but the arrest was not made until they reached Dallas. In this connection, the State also showed that appellant, on his arrest by the officer, manifested some anxiety to know for what he was arrested; and, when informed that it was for rape, he seemed to be very much disturbed. When fastened in the calaboose, he at once attempted to effect his escape by tearing a hole through the roof of the building. He told the officers that he did not intend, if he could help it, to be taken back to Ellis County, to be tried for said offense by a jury of farmers. In reply to the direct question if he had committed the offense, he said, "Damn them, they will have to prove it," and repeated this several times. It was further shown, in regard to his leaving Ennis, that it was without the knowledge of his employer, Hyman, who expected him to remain with him. He gave the porter of the hotel the keys belonging to his employer, and told him to tell him if he wanted

him to telegraph him at Dallas, in care of the postoffice. Appellant explains this hurried trip to Dallas by a sudden desire on his part (it being Sunday) to go to that place to see his wife and children. The evidence shows that appellant and his employer only reached Ennis late on the evening before; that he had an opportunity to see into the room of the prosecutrix, and to know that that was her sleeping apartment. He saw her go into said room through the sample room, and, on leaving the room and returning to the main building, he had some conversation with her. He asked her if she did not formerly live in Kaufman, and he says that in that conversation he informed her that he had a wife and two children in Dallas. From the testimony, appellant appears to have either previously known Smith (the hotel porter), or become acquainted with him on this trip. He arranged with Smith (who occupied a house at Ennis) to sleep at his house on that night. Smith and defendant, in the early part of the night, went to see one Emma Foster, and stayed there for some time. When they left, appellant made an arrangement to come back and stay with her that night. The testimony tends to show that he did go back, but was unable to get in the house. He did not go to Smith's to sleep, as he had promised, but explains this by stating that he was unable to find Smith's house, which had been pointed out to him, because the light had gone out which Smith had left for him in the room. The State's evidence shows that he stated the next morning to Smith and another that he slept in the sample room, next to the room of the prosecutrix. He denied this, and stated that, after being disappointed in failing to find Smith's house, he sought quarters under the Midland freight depot; that he got up on a cross-piece or brace running between the pillars that support the building, and slept there that night. In regard to this, the State offered some testimony showing that it was unreasonable that he could have slept on one of those cross-pieces under the depot.

From this testimony, were the jury justified in finding their verdict,—in other words, does the evidence establish beyond a reasonable doubt that appellant copulated with the prosecutrix without her consent, by the use of force, or force and threats combined? Our statute provides and all the authorities teach that, before this offense is made out, it must be shown that the prosecutrix did not consent to the act of copulation, and she must have put forth all the resistance within her power, considering the circumstances surrounding her at the time. If she did not do so, the presumption will be that her resistance was not bona fide, and that she consented to the act. In determining, however, the degree of her resistance, and the sufficiency of the force used by appellant, all the surrounding circumstances may be looked to; and in this connection, as a potential factor entering into the force that may have been used, we are authorized to consider any threats that may have been made by the appellant at the time. The alleged outrage was shown to have been committed at night. The prosecutrix was isolated, no one being in the room with her except her 8-year-old child. Under these circumstances she is

awakened. Violent hands are laid upon her. She starts to make outcry, but is immediately told by appellant that, if she does make any disturbance or noise, he will kill both herself and child. She apparently is entirely within his power. Still she does not consent to the act of copulation; but appellant, by his threats and violence, renders her helpless, and accomplishes his purpose. The fact that he may have had a conversation with her in whispered tones during this time is not inconsistent with the use of force on his part. But this very conversation is reasonably accounted for in the testimony of the prosecutrix. He imposed quiet and silence by his threats, and, not content with her simple promise not to betray him, he required a solemn oath from her to that effect. The circumstances indicate that he not only used force, as shown by the bruises on her person, but that he overcame her with threats that were calculated to render her helpless. That she did not make outcry at the time is accounted for by his conduct; and the fact that she did not flee immediately from the room to report the matter before daylight is also reasonably accounted for. She knew that he was in the next room, and she had been told by defendant that, if she attempted to leave the room that night, he would kill both her and her child. She evidently gave information of the outrage that had been perpetrated upon her as soon as daylight came. If she needed corroboration as to the violence, this was furnished in the testimony of Mrs. King. If further corroboration were needed, this was had in the conduct of appellant himself. His sudden and unexpected to trip to Dallas, notwithstanding his version of that matter, reasonably indicates that some great apprehension was operating on his mind; especially when viewed in connection with his acts and conduct at the time of and immediately after his arrest; also his contradictory statements in regard to the place where he slept on the night of the alleged outrage. In fact, all the circumstances transpiring after the alleged outrage shed light upon, and lend force to, the testimony of the prosecutrix. We have given the record a careful examination, both because of the gravity of the charge and the severe penalty inflicted; and, after that investigation, we are constrained to the opinion that the jury were fully warranted in finding that all the constituent elements of the offense of rape were proved, and they were justified, under the law, in finding appellant guilty, and visiting upon him the severest punishment authorized by the statute. Finding no error in the record, the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.