## BEN WALKER V. THE STATE.

No. 22064.   Delivered April 8, 1942.
Rehearing Denied May 27, 1942.
Appellant's Request for Leave to File Second Motion for
Rehearing Denied (Without Written Opinion) June 10, 1942.

The opinion states the case.

*Percy Woodard* and *Reagon Huffman,* both of Marshall, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged with rape, and by the jury given a penalty of death.

Appellant is a negro, and the injured party, Mary Faye Campbell, is a white girl eighteen years of age.

There are no bills of exceptions in the record.

The facts relied upon by the State show that Mr. and Mrs. Kuhn were the proprietors of a dine and drink place at or near Caddo Lake. That there were employed there a woman, Lena Turner, the colored cook, Evans Perry, a colored man, and Mary Faye Campbell. On October 1, 1941, Mr. and Mrs. Kuhn went to Gladewater to see a dentist about Mrs. Kuhn's teeth, and expected to be home that night, but had left Mary Faye Campbell in charge of the place of business. During the night a number of soldiers came into this place and ordered meals, and were drinking beer. Mr. and Mrs. Buddy Collins also came in about such time and had some two gallons of whisky, evidently bootleg, as same was untaxed. Mrs. Collins seemed to have ignored her husband in the presence of the soldiers, and doubtless engaged in some dancing over his objection. As the night lengthened the noise and confusion grew louder, and eventually ended in a fight between Mr. Collins and some of the soldiers, finally ending in one of the soldiers being thrown through a window. It also seems that Mary Faye Campbell and Mrs. Collins had an argument of some kind over the conduct of the Collins' family. Mr. and Mrs. Kuhn did not return as they had hoped on the night of October 1, 1941, and that left Mary Faye Campbell to sleep alone in the lodge while the two negro employees slept at some short distance in one of the cabins attached to this lodge or restaurant.

The State's testimony shows that after the crowd had gone from the Kuhn place, and the dancing was over, some of the negroes and doubtless Mr. and Mrs. Collins went to the negro cabin and engaged in a poker game. The lodge or restaurant building was a two story affair, the lower floor being the place of business and the upper story the residence of Mr. and Mrs. Kuhn, where prosecutrix usually slept at nighttime, and during the difficulty between the soldiers and Mr. Collins some windows had been broken out of the lower part of the lodge, and about 2:30 in the morning Mary Faye Campbell closed the doors of the restaurant and laid down on a couch on the lower floor to sleep with her clothes on. Soon she heard some one knock on the door, who said it was Ben, and she went to the door and he said he wanted to tell her what Buddy Collins was planning to do. She "undid" the door, and Ben Walker put his foot inside the door so she could not close it, and pushed it open and grabbed her, and she began to struggle with him,

he being much stronger and larger than she was. There was a pistol on the table near the door, and appellant caught up the pistol, pulled the hammer back, and told Mary Faye that had she rather do what he wanted to do or had she rather die. She told him that didn't he know he could not get away with that. She said he replied: "If I leave now you will tell it and I will have to die being innocent and I just as well do it, so if I have to die I will know I did it." Appellant kept pushing her back and struggling with her, and pulling her clothes off her, she crying and resisting, and appellant finally laid the gun down and went to tearing her clothes off her, threw her down on the couch and had intercourse with her. Before leaving he struck her with the pistol over the head. When he got up off her she promised him to meet him at the beer boat the next night. "I promised him I would do that because he threatened to kill me." I was in fear of my life that night. If he had not have accomplished his purpose, I believe I would have been dead." There were only the two negro employees to whom she could appeal, and she said nothing to them, though Lena Turner, the cook, testified that she heard her screaming and going on about 6 o'clock and went up to the lodge and found her in such condition, and saw her mouth bleeding. She asked Mary Faye what was the matter but she was unable to tell her. Ike Oliver also saw her crying on the following morning.

Mrs. Kuhn got back about 6:30 in the evening and Mary Faye asked her to go upstairs with her, and she told Mrs. Kuhn the whole occurrence, it being the first time she had told anyone. Mrs. Kuhn testified:

"Miss Campbell was sitting on the front porch when we got back. She was just sitting there. I saw her and thought she was troubled about something and we heard before we arrived they had had a little trouble, and I asked her what the trouble was. She was terribly depressed and had been crying and her eyes were swollen, and I couldn't understand why she would feel so bad about just a little trouble. I questioned why she would feel so badly and she said that wasn't all the trouble. I took her upstairs and she told me of her trouble. She told me a negro had assaulted her, and she said it was Ben Walker. I immediately arranged to take her to the hospital. Her mouth was bleeding and she had quite a bruise on her temple.

"Q. The day following that did you have occasion to see her? A. Well, I saw her when we were called in here on the preliminary hearing.

"I noticed that night when we brought her to town that she was spitting up blood. She showed me her mouth was still sore, that is, I think two or three days after this happened; it was when we were called in on the hearing."

Appellant took the stand in his own behalf and testified that the young lady solicited him to stay with her awhile that night. "She said 'Stay with me a while, you needn't worry and go around gray headed' "; that she then gave him a choke, and led him to the couch and set down, and asked him "if he cared anything about loving." Eventually he claimed that she seduced him, and that he had an act of intercourse with her with her consent.

This conduct upon the part of the young lady was denied by her, and we thus have a conflict in the testimony. The matter was presented by the court to the jury, and they have decided the issue against appellant's version thereof. Under the law that was their prerogative, and we do not think their verdict should be disturbed.

There are no bills of exceptions and no objections to the court's charge. We are cited to but one case in appellant's brief, and that is the case of White v. State, 4 S. W. (2d) 37, which is claimed to be analogous to the facts herein. The facts in that case are wholly dissimilar to the instant case. In the White case prosecutrix said, among other things: "I just laid down and he got on top of me. I didn't make any outcry or attempt to get out from under him. I could have got out from under him if I had wanted to."

It is worthy of notice that appellant was possessed of a pistol, and used same threateningly, so the State, contended, and Miss Campbell said she yielded in order to save her life.

Mr. Branch, in his Penal Code, page 998, says:

"Threats apart, every exertion in the power of the woman, under the circumstances, must be made to prevent the penetration of her person, or consent will be presumed." Mooney v. State, 29 Texas Crim. Rep. 257, 15 S. W. 724.

Again, Mr. Branch says, p. 1000, Sec. 1782:

"When both force and threats are alleged and there is evidence of each, it is not necessary that either the force or the threats alone measure up to the standard of the statutory definition; the cogency which one contributes to the other may be sufficient to constitute all that is required. Sharp v. State, 15 Texas Crim. Rep. 185; Bass v. State, 16 Texas Crim. App. 62; Sawyer v. State, 39 Texas Crim. Rep. 557, 47 S. W. 650; Perez v. State, 50 Texas Crim. Rep. 37, 94 S. W. 1036; Brown v. State, 52 Texas Crim. Rep. 267, 106 S. W. 368; Cole v. State, 57 Texas Crim. Rep. 51, 123 S. W. 410."

We think the testimony measures up to the standard required by the law, and though the verdict exacts the extreme penalty of the law, such penalty is one provided by law, and we think within the power of the jury to award, whose duty it was to decide upon the same.

It is argued that this crime evidenced no bestiality, evidently carrying with such statement a suggestion that a jury should have found such extenuating circumstances that they would have stopped short of the extreme penalty in their verdict. Such a circumstance, if it did exist, was doubtless called to their attention, but same can have no weight with this court, as the fixing of the verdict, either its severity of its leniency, is not a matter over which this court has control.

Finding no error in the record, the judgment is affirmed.

### ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

We have considered the record in this case in the light of appellant's very earnest motion for rehearing and, while the argument presented must appeal to any right-thinking mind, it is, nevertheless, on the weight of the evidence and appropriate only for the consideration of a jury. It is the duty of this court to consider all of the testimony in the case where the question presented to us is insufficiency of the evidence to support the jury's finding. This we did in the original opinion. Concluding that there is direct and positive testimony showing the perpetration of a brutal crime, it is inevitable that appellant's denial of this testimony only raises an issue for the jury.

There are circumstances of this case which a jury should weigh, and likely did, in considering the evidence both for and against appellant. The jury would have been justified in believing appellant's story and of acquitting him for the crime, but they did not do it. Appellant's counsel is probably justified under all of the facts of the case in presenting the argument that the prosecuting witness is not an admirable character. No doubt he presented this same argument to the jury of twelve men who were in better position to understand the force of it after having heard both parties testify than this court could possibly be. It is noted that the record also reveals from the appellant's own testimony that he was a gambling negro who had spent most of the night in playing poker with both negroes and white folks. His story of the invitation of an eighteen year old white girl to spend the rest of the night with her and the detailed story of her solicitations is so shocking that it is not suprising a jury refused to believe him. It is so unnatural that one could hardly expect twelve men to agree to its truthfulness unless it was strongly corroborated. So far as we are able to tell from the record of the case there is nothing to do this. The acts of the prosecuting witness on the following day are also unnatural, but they consist more of her failure to do than of anything affirmatively indicating the falsity of her story. Consequently, the jury was warranted in concluding that the circumstances surrounding her explained and excused her failure to tell about it until the return of her employers late in the afternoon. We find nothing contradictory and all of the facts were before the jury for their consideration.

The evidence of Dr. Wyatt in describing the physical facts which he discovered do not in any sense contradict the story which the prosecuting witness gave because the force which she described consisted solely of striking her and in threats to take her life while appellant had the pistol in his hands or available to him and was in position to carry out his threats. She described nothing that would indicate the kind and character of force which Dr. Wyatt had in mind when he said he found no evidence of it.

Appellant is referred to as a helpless negro boy in the hands of an attorney appointed by the court to represent him, but the record discloses that he was ably represented in the trial court, as well as before this court. It will also be noted in explanation of the apparent unnatural conduct of the prose-

cuting witness that she was situated in a very unfavorable position. It is likely she felt she could have no sympathy or assistance from those near her and the evidence fails to reflect that she did have any such assistance at any time from any of them other than Mrs. Kuhn who was not present until late in the afternoon of the next day.

While the whole story of the case is one that is unfavorable for the infliction of the death penalty because of the things discussed in the original opinion and herein mentioned, still, the issue is a matter exclusively within the province of the jury. Unless there is an error of law or a lack of sufficient evidence upon which a jury may, as a matter of law, find the appellant guilty, this court is intrusted with no responsibility or power in the matter. As we view it, that is the situation and whatever appeal there may be in the record is by our law delegated to the sound judgment and discretion of another agency of our government.

Finding no error of law, the motion for rehearing is overruled.