JOE ARNETT v. THE STATE.

No. 1725. Decided May 31, 1899.

**Rape—Evidence Insufficient.**

See opinion of a majority of the court for evidence which is held wholly insufficient to support a verdict and judgment of conviction for rape.

HENDERSON, Judge, dissenting, holds that there is evidence sufficient to support the conviction, and that the well established doctrine is that the court, on appeal, will not disturb a verdict where the testimony is sufficient to support it, although, in the opinion of the appellate court, the weight of the testimony may be against the verdict. Citing White v. State, 34 Texas Criminal Reports, 153.

APPEAL from the District Court of Robertson. Tried below before Hon. W. G. TALIAFERRO.

Appeal from a conviction for rape; penalty, five years imprisonment in the penitentiary.

The facts are fully stated in the opinion.

*J. R. Astin* and *Simmons & Crawford,* for appellant.

*Robt. A. John,* Assistant Attorney-General, for the State.—Should the facts be deemed sufficient, the judgment should be affirmed.

BROOKS, JUDGE.—Appellant was convicted of the offense of rape, and his punishment assessed at five years confinement in the penitentiary; and he appeals.

The following is, in substance, all the evidence adduced upon the trial:

The prosecutrix, Clara Wiley, testified: That during August, 1898, she was working on the Astin plantation, in Robertson County, near Mumford, and on that evening defendant came from Hearne, down the railroad, to Mrs. Astin's residence, where she was working. "He told me that he had come by my house, and that Uncle Joe (my husband) was sick, and he gave him a dram. He had some pears for Mrs. Astin, and delivered them. Shortly after that I left Mrs. Astin's house and started home. I went up through the field by Lucy Scoggins' house, and through the wire fence, and started along the path between the corn and cotton towards my home. Just after I crossed the wire fence, some fifteen or twenty steps from the fence, defendant overtook me, and put his hand on my shoulder and asked me for some. I told him to go away and let me alone. He caught me around the neck, and pushed me down between the corn rows, four or five steps from the path, and got on top of me. I tried to hollo and did hollo some, and he reached down and got a handful of dirt and put in my mouth. I tried to push him off, and he scratched my face, and did what he wanted to with me. He ravished me. I did not consent for defendant to have carnal intercourse with me. He kept me down a long time. I don't know how long, but it seemed to me like it was two or three hours. He tore my dress nearly off. When he got through I got up, and he hit me in the mouth with his hand, knocked out some of my teeth, and made my mouth bleed. I went on towards home, holloing as loud as I could. When I got nearly home my husband, Joe Wiley, came out and met me, and I told him that defendant Joe Arnett had ravished me. I started up towards the manager's house, and met John Astin. I told him that Joe Arnett had ravished me. He was on his horse, and he rode back down the path, and I went with him and showed him where Joe Arnett ravished me. I lost my belt at the place where defendant assaulted me, and after I left the place, running towards home, and before I met my husband, I lost one shoe off my foot. After I showed John Astin the place on the ground that defendant assaulted me I went down past Ruth Wyatt's house to the

Astin residence, and then went back home. A day or two after that I walked to Hearne, about twelve miles, and put in the case against defendant before the justice of the peace." On cross-examination she further testified: "I do not know how old I am. I have been married to Joe Wiley twenty-five or thirty years. I had one child when I was married to him. It is not his child, and I had not been married to anybody when I had my first child. I have had sixteen children. My youngest child is about four years old. I reckon I must be about sixty-five years old. Joe Arnett did not offer me a dollar to have intercourse with me. I did not promise him that he might have carnal intercourse with me. He did not offer me a dress. When he overtook me at the place where he assaulted me the first I saw of him was when he put his hand on my shoulder. I looked around, and he had his great big thing out of his pants, and it was going this way. [The witness here moved her hand from right to left.] He just rode me nearly to death. Lucy Scoggins and Lottie Brown were at home when I passed their house, just before defendant assaulted me. I ran away from my husband a year or two ago, and went to Bryan, because he drank too much, and John Astin brought me back home. He did get after me sometimes about men giving me dips of snuff. I don't know what I was doing with my hands when defendant was ravishing me."

Joe Wiley, for the State, testified: "I am the husband of Clara Wiley. On the day of the assault, defendant, Joe Arnett, had been up to Hearne, and came home on the Brazos Valley Railroad. He came on from the station down by my house, and came in. He had a sack with something in it. He said, 'Uncle Joe, how are you?' and I replied that I was poorly, and 'you have just come from Hearne, and didn't bring your Uncle Joe something to drink?' He said, 'Yes; I have got something for you to drink,' and pulled out a little flask of whisky from his pocket and handed it me. I took it and drank nearly all of it, and handed the bottle back to him. After talking a few minutes he left, carrying the sack with him. About three-fourths of an hour or an hour afterwards I heard my wife screaming. I ran out, and she was coming down the path from towards Lucy Scoggins' house. I met her about 100 yards from my house, and she told me that Joe Arnett had ravished her. She was howling and crying. She went on past our house, and about fifty yards beyond met John Astin on horseback. She turned around, and went back up the path with John Astin, to show him the place where she said Arnett ravished her." On cross-examination he stated that Clara Wiley and he had been married about forty years; that she had one child when he married her, and that she has had fifteen children since their marriage; that she was about 73 years of age, and three or four years older than he was. Her youngest child is about three or four years old, and she must have been 69 when it was born. Witness did not know whether she had ever had a change of life or not. "It is about one-fourth of a mile from our house to Lucy Scoggins' house. When I first heard my wife screaming she was about 200 yards from my house, coming from towards Lucy Scoggins' house."

Joe Arnett, defendant, testified as follows: "I live on the Astin plantation, near Mumford, and have lived there since I was a small boy. On the day that I was charged with raping Clara Wiley I was in Hearne, and left there and arrived at Mumford in the evening on the railroad. Mr. Ferguson gave me some pears at Hearne, in a sack, and told me to deliver them to Mrs. Astin. When I arrived at Mumford I left the depot, went down by the house where the manager of the Astin plantation resided, and on down the road towards Mrs. Astin's, that led by Joe Wiley's house. When I got to Joe Wiley's I went in the house and found Joe Wiley there, complaining of being sick." He then states substantially the conversation between them as did the witness Joe Wiley, and that he gave him the bottle of whisky, and he drank it nearly all up and returned it to him. "I then got up and went home. Went to Mrs. Astin's and gave her the pears that Ferguson had sent. I saw Clara Wiley there. I went over to my house, a short distance from Mrs. Astin's. When I saw Clara Wiley at Mrs. Astin's house she asked me if I had come by her house. I told her, 'Yes,' and that Uncle Joe Wiley said he was sick. After I had gone over to my house, pretty soon Clara Wiley came by there and said to me, 'You say Joe Wiley was sick?' I said, 'Yes; and I gave him a dram.' A few days before that I had asked her to give me some, and while she was talking to me at my house that evening she made mention of it. When I asked her for it, she had promised to give me some, and when she made mention of it again I asked her for some again, and she said that if I would keep my mouth, like Mr. Scott, she would give me some. I told her if she would I would give her a new dress. She said, 'No; I don't want a dress, because Joe Wiley would find it out; but you give me a dollar, and I can use it, and he won't find it out.' She said, 'I want to go to the baptizing next Sunday, and want a dollar to buy some things.' I said, 'All right, I'll give you a dollar if you will give me some.' She said, 'All right,' and started on up past Lucy Scoggins' house, towards her home. I wanted to go up to the barn and help feed the stock, so I started on up the same way that Clara went, as that was my best route to the barn. Clara passed Lucy Scoggins' house, and went on out through the wire fence; and I overtook her about the fence and told her 'to give me some now, and I would give her a dollar.' She said, 'All right.' We went about fifteen steps inside of the fence and about four or five steps from the path into the high corn, and she laid down, and I got on top of her, and before I got through she said: 'Be in a hurry. Somebody might come along here and catch us.' I said, 'I ain't done.' She began to push me, and said, 'Get up. Somebody might catch us.' I didn't get up, and she said, 'Get up, and give me a dollar.' And I said, 'I haven't got the dollar, but will give it to you some other time.' Then she got mad, and got up and started off down the path towards her home; and when she got nearly halfway home she began to hollo and cry, and went on towards home, holloing and crying. That frightened me, and I concluded that I would not go on up to the barn, and I turned and went back down to the big pecan tree near my house, and after awhile

John Astin came down there and asked me what I had done to Mrs. Wiley. I told him, 'Nothing.' He said, 'She says you raped her.' I said I didn't do it, that she gave me some, and I promised her a dollar, and didn't have the dollar to give her, and she got mad. I told him what happened, just like I have told it here." On cross-examination he stated "that he had been indicted in this court once before for this same kind of an offense, and once for assault with intent to murder; that he pleaded guilty to an aggravated assault in the rape case, and was fined $25 and costs, and paid it. In the assault with intent to murder case he was acquitted."

John Astin, for defendant, testified: That on the evening of the alleged rape he was sitting on the gallery of the manager's house, north of Clara and Joe Wiley's house, and about a mile from the Astin residence, and about 300 or 400 yards from Clara Wiley's house. "About three-fourths of an hour or an hour after the train arrived I heard some one screaming near Joe Wiley's house. It sounded like perhaps a couple of hundred yards west of Wiley's house. I jumped on my horse, and about forty or fifty yards from her house met Clara Wiley. She was crying, and said that Joe Arnett had raped her, and went with me to show me the place of the alleged rape. When we got within fifteen steps of the wire fence, near Lucy Scoggins' house, she pointed out the place to me, about four or five steps from the path in the high corn, and about fifteen steps from the wire fence. This was about seventy-five yards from Lucy Scoggins' house. I examined the ground, and saw no sign of a struggle. It looked like a person had lain down on the ground between the corn rows, but saw no corn broke down, no deep tracks, no dirt kicked up, and nothing that indicated any struggle between persons on the ground. I found no belt or piece of rope. I did not see any shoe about the place or along the path as we went there. Clara's dress was slightly torn. I saw no scratches or bruises about her face. I saw a little blood in her mouth. I went on down to a pecan tree near defendant's house, and found defendant Arnett there. He made no effort to escape. I asked him what he had done to old Clara. He said he had done nothing to her, and I said, 'She says you raped her.' He said: 'Mr. Johnnie, I didn't do it. I asked her for some, and she gave it to me. I first promised her a new dress, and she said, "No;" Joe Wiley would find it out if I gave her a dress. And I promised her a dollar, and she said she would give it to me for a dollar; and, after I got it I didn't have the dollar to give her, and then she went off towards home, holloing.' " Witness also stated that Clara Wiley's reputation for virtue and chastity was bad, and that her front teeth had been out for several years before the alleged assault, and that she had run off from her husband, and he had brought her back home.

Ruth Wyatt, a sister of defendant, testified on his behalf: That she lived about 200 yards from Lucy Scoggins' house, and about the same distance from where the assault is said to have occurred. That she was

at home on that evening, and heard no outcry or scream at all, and if there had been any screaming she would have heard it. That she saw Clara Wiley that evening after the assault is claimed to have occurred, and saw no scratches or bruises about her face, and no blood about her. Her dress was a little torn, but no more than usual. She generally wore ragged and torn clothes on the plantation at that season of the year. She also states that the prosecutrix's reputation for virtue and chastity was bad, and that she lost her front teeth a long time before the time of the alleged assault.

Lucy Scoggins and daughter, Lottie Brown, testified for defendant that they were at home on the evening of the alleged assault, and that prosecutrix passed their house on her way home, and about four of five minutes afterwards defendant came along; that they heard no outcry or screaming, and if they had would have gone out there; that their house was the nearest to the place of the alleged assault; that they did not know anything had occurred until John Astin came down.

The above is in substance all the testimony adduced on the trial, both on behalf of the State and the defendant.

In the view we take of the record, it is only necessary to consider appellant's sixth and seventh assignments of error, as follows: "Sixth. The court erred in not granting defendant a new trial, because the truth of the case is that said Clara Wiley consented to having intercourse with defendant for the cash consideration of one dollar; that when she learned that defendant did not have the dollar to pay her, that she became enraged and endeavored to throw defendant off; that he resisted and tried to console said Clara, but she finally withdrew herself from defendant before he was ready for her to do so; that the cry and charge of rape is a fabrication. Seventh. The court erred in not granting defendant a new trial for the reason that the preponderance of evidence clearly shows that defendant had intercourse with said Clara with her consent,—that no force whatever was used; that, on account of illegal evidence having been admitted against him, the minds of the jury were influenced against him; that he has not had a fair and impartial trial; that justice has not been done him."

Among other things made apparent by the above statement of the evidence is this: The prosecutrix states: That appellant caught her around the neck, and pushed her down between the corn rows, four or five steps from the path, and got on top of her. That "I tried to hollo, and did hollo some; and he reached down and got a handful of dirt and put in my mouth. He tore my dress nearly off. When he got through he hit me in the mouth with his hand, knocked out some of my teeth, and made my mouth bleed. I went towards home, holloing as loud as I could. I lost my belt at the place where the defendant assaulted me. I lost one shoe off my foot." She states that she has been married thirty years, had one child when she married, and had not been married to anybody when she had the first child; had had sixteen children, the youngest being

about four years old. She says "she reckons she must be 65 years old." Lucy Scoggins and Lottie Brown were at home when the prosecutrix passed their house just before appellant assaulted her. Prosecutrix ran away from her husband a year or two ago, and John Astin brought her back,—and that her husband did get after her sometimes about men giving her dips of snuff. Prosecutrix said she did not know what she was doing with her hands when defendant ravished her. The husband of prosecutrix testified that she was about 73 years of age; that it is about one-fourth of a mile from prosecutrix's house to Lucy Scoggins' house. When her husband first heard her screaming she was about 200 yards from home, coming from towards Lucy Scoggins' house. It will be seen, from an inspection of this summary of prosecutrix's statement, that, if any rape was committed, it was committed four or five steps from the regular path leading by Lucy Scoggins' house to the home of prosecutrix, No witness testifies as to the clothing being torn off of appellant, but all of them state that it is absolutely false, and state that her teeth were knocked out long prior to the date she accused appellant of ravishing her. There is no proof of any shoe of hers being found at the scene, or any belt. In fact, her own testimony refutes her own statement. The rape, if any, occurred in the daytime, about seventy-five yards from the home of Lucy Scoggins. John Astin testified for defendant that he examined the ground immediately after the outcry being made by prosecutrix, and saw no sign of a struggle, but the ground looked like a person had lain on the ground between the corn rows. Saw no corn broken down, no deep tracks, no dirt kicked up, and nothing that indicated a struggle between persons on the ground. Witness found no belt or piece of rope, and did not see any shoe about the place or along the path as they went there. Prosecutrix's dress was slightly torn, and he saw no scratches or bruises about her face. If prosecutrix had made any outcry, Lucy Scoggins and her daughter testified that they would have heard it; that prosecutrix passed their house, and four or five minutes afterwards defendant came along; that they heard no outcry or screaming. It was also proved that the dress of prosecutrix was a little torn, but that she generally wore ragged and torn clothes on the plantation at that season of the year. In the light of this record we can not let this verdict stand. If a rape occurred, it was in broad daylight. There was no outcry at the time, and so far as the record shows, no scuffle, no injury to the prosecutrix; and none of the facts that she states that would go to corroborate her are proven, but all the facts, save and except the bare fact that when she was near home she was heard holloing and crying, show that her statement is a fabrication. This, together with the further fact that appellant made no effort to escape, but remained upon the plantation and gave an explanation about the matter when first approached in keeping with the probable truth of the matter, all lead irresistibly to the conclusion that appellant is not guilty of rape. The judgment is therefore reversed, and the cause remanded.

*Reversed and remanded.*

HENDERSON, JUDGE (Dissenting.)—By the opinion of a majority of the court this case has been reversed and remanded on the ground that the evidence does not support the verdict. I have examined the record carefully, and can not agree to this disposition of the case, without consenting to overthrow a well-established doctrine of this court, founded upon a long line of precedents, to the effect that we will not disturb a verdict, where the testimony is sufficient to support it, although to our minds the weight of the testimony may be against the verdict. In such case we concede that the judge below, who heard the testimony and saw the witnesses, is in a far better position to judge of their credibility than this court. The testimony is contained in the opinion of the majority of the court, and it is not necessary here to restate it. There is no controversy as to the act of carnal intercourse; the only question being whether or not the same was accomplished with consent, or by force and without the consent of the prosecutrix. As to this matter there is a clear conflict between the prosecutrix, on one side, and the defendant on the other; these being the sole witnesses who testified to the act of intercourse, and what occurred immediately thereafter. I do not understand, by the opinion rendered by the majority, that the court do not concede that the testimony of the prosecutrix makes out a complete case of carnal intercourse accomplished by force. It is insisted, however, that her credit is shaken because defendant has contradicted her testimony in certain particulars. For instance, there is some controversy about her giving immediate outcry. She says that while the act was being accomplished she holloed or tried to hollo, but defendant prevented her. The proof shows, unquestionably, that immediately afterwards she ran from the place to her home, holloing and screaming; for John Astin, the principal witness for defendant, testified that he heard her screams while he was at his manager's house, some 400 yards from Joe Wiley's, and it sounded as if she was 200 yards west of her house, and went down there on his horse, and met her going to her house. And I consider it an important circumstance of corroboration that he states he saw blood in her mouth,—the prosecutrix having stated that defendant struck her in the mouth. As to not finding the shoe and belt, the record does not show that anyone looked for them. Prosecutrix pointed out the place where she was thrown down; and, while Astin stated he saw no evidence of the ground being torn up, yet there were indications on the ground that some person had lain down there. And I further consider it significant that appellant did not go to his home, which was close by, but was found down near the river, under a pecan tree, by his employer, Astin. It occurs to me that the theory of the defense is extraordinary. It asks us to assume, in the face of the prosecutrix's testimony to the effect that she was raped by force, that she had copulated with defendant voluntarily, and then, because he refused to pay her, that she gave the alarm; that is, having consented to an act of copulation, because he refused to pay her she made outcry and published her own shame. This, to say the least of it, is calculated to tax one's credulity. I can not regard it as a safe

rule to overturn the long-established precedents in favor of the inviolability of verdicts which, though contradicted, are supported by evidence, and which have received the approval of the trial judge. I think the rule on this subject was well stated in White v. State, 34 Texas Criminal Reports, 153. That was a case for assault with intent to murder. There were three eyewitnesses to the assault. The prosecutor alone made a case for the State, and he was directly contradicted by the two other witnesses, who made a complete case of self-defense. The prosecuting witness was also impeached by five witnesses, who stated that his reputation was such that he ought not to be believed on oath. The jury, however, convicted defendant, and the judge below approved the sentence. On appeal this court said: "This court has sometimes interfered, even after the approval of the verdict by the court below, and granted a new trial, where there was not sufficient evidence to sustain the finding of the jury; but the instances are rare where we have interfered, where there was evidence to sustain the verdict, though apparently the record disclosed that the weight or preponderance of testimony was the other way,—this court, in that regard, conceding much to the verdict of the jury, and the approval of the judge below, who saw and heard the witnesses testify, and on this account were better able to judge of their credibility than we, who have to pass upon the case from a bare inspection of the record. And in this case we follow the rule heretofore laid down,—that the jury having solved the issue presented in the testimony under a fair and proper charge of the court, and having found defendant guilty of an assault with intent to murder, and that verdict having been approved by the judge who tried the case, and there being sufficient evidence in the record to sustain that verdict, we will not disturb it." The rule above laid down has been followed from the early history of our jurisprudence up to the present time. See White v. State, 50 S. W. Rep., 1015. Suffice it to say, in this case the jury had all the testimony pro and con before them, and although the prosecutrix contradicted herself in some collateral matters, and her testimony was directly traversed by the evidence of the defendant himself, yet the jury believed her statement; and, no doubt, they felt the more inclined to do this because the testimony of appellant was discredited by an admission on his part that he had previously been indicted for a similar offense, and entered a plea of guilty on the indictment to an aggravated assault. I do not believe this court is authorized to disturb the finding of the jury, and that the action of the court makes a dangerous precedent in the administration of law.