## WILEY SMITH v. THE STATE.

No. 4048. Decided May 26, 1909.

**1.—Rape—Conduct of Prosecuting Attorney—Practice.**

The court should promptly suppress any conduct of attorneys in the case, which is disorderly in the trial of a criminal cause.

**2.—Same—Reading Law to Jury—Discretion of Court.**

Reading law in the trial of criminal cases is a matter largely in the discretion of the trial judge, and there was no error in the court's refusal to permit counsel for the defendant to read a lengthy statement of facts from a case in the reports.

**3.—Same—Evidence—Credibility of Witness.**

Where upon trial for rape, testimony of the defense to show that some of the relations of the prosecutrix had been guilty of seduction in years gone by, and which was rather remote in time, was excluded, there was no reversible error.

**4.—Same—Charge of Court—Consent—Letters—Force.**

Where upon trial for rape, certain letters and postal cards written by the prosecutrix were in evidence, which were more or less lascivious, and .there was also testimony showing consent of the prosecutrix, the court erred in informing the jury that they might use the evidence of the letters and postal cards to show consent, and yet withdrew from them the right to consider this evidence as it bore upon the issue of force.

**5.—Same—Force—Want of Consent—Feigned Resistance.**

A feigned resistance of the prosecutrix would not constitute rape; if there was consent, then the force used by the assailant would make no difference. There must be a combination of force and want of consent, in order to constitute rape where force is the ground alleged. Following Mooney v. State, 29 Texas Crim. App., 257.

Appeal from the District Court of Leon.   Tried below before the Hon. S. W. Dean.

Appeal from a conviction of rape; penalty, five years confinement in the penitentiary.

The opinion states the case.

*W. S. Poston, Wm. Watson* and *Kenley & Minton,* for appellant.— On question of consent: Pless v. State, 23 Texas Crim. Rep., 73; 3 S. W. Rep., 576; Davis v. State, 42 Texas, 226.   On question of force: Edmonson v. State, 44 S. W. Rep., 154; Perez v. State. 48 Texas Crim. Rep., 225; 87 S. W. Rep., 350.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of the crime of rape alleged to have been committed upon the person of Mamie Edgley, his punishment being assessed at five years confinement in the penitentiary.

The record is quite voluminous, and the evidence is gone into in unnecessary detail in the statement of facts.   Some of the questions we do not deem of sufficient importance to discuss, and some of them are unnecessary to be mentioned, as they will not occur upon another trial.

1. Several bills of exception were reserved to the conduct of the prosecuting attorneys, in which it is contended that they were discourteous to opposing counsel to such an extent that it operated injuriously to their client's interest during the trial.   The qualification to these bills of exception by the court to a large extent modifies and minimizes the contention of appellant.   Without passing upon these matters, we would suggest and say that in the trial of cases the court should promptly suppress any conduct of the sort mentioned in the record, and use the authority of the court sufficiently to prevent such occurrences. We are not undertaking here to review these matters.   The court does not place all the blame upon counsel for prosecution.   Be that as it

may, these matters should not occur during the trial of cases, and, when begun, should be promptly suppressed, to the end that cases may be tried in an orderly manner, without getting into the record and before the jury extraneous matters of this character.

2. Appellant reserved a bill of exceptions to the court's refusal to permit him to read a lengthy statement of facts from a case reported in the 44 S. W. Rep. We are of opinion, as the bill shows this matter, this was not error. In fact, we are of opinion the court ruled correctly. Even where it is a question of reading law to the jury it is a matter largely in the discretion of the trial judge. In this particular bill it is contended that the court erred in not permitting counsel to read voluminous facts from a reported case.

3. There was some question about the fairness and impartiality of a juror who tried the case, and evidence introduced pro and con as to whether he was an impartial juror or not. This will not occur upon another trial, and we will, therefore, not discuss the matter.

4. Appellant sought to introduce in evidence the fact that some of the relations of the prosecutrix had been guilty of seduction in years gone by. This was offered for the purpose of showing that she associated with people whose ideas of virtue were rather loose and at a low ebb. As this matter is presented, we are of opinion that this evidence was not admissible, and that it is not of sufficient importance to require a reversal. It was rather too remote in time.

5. Among other things, the court gave the following charge: "And in this connection you are further instructed that the postal cards and letters in evidence are to be considered by the jury only in passing upon the credibility of the witness Mamie Edgley, and upon the probability or improbability of consent by her, and are not to be considered by the jury as in any manner affecting the question of force, and will not be considered by you for any other purpose than these named." Several objections are urged to this charge. We think they are well taken. The question of consent in the case was one of most serious import, and about which much evidence was introduced. It may be necessary to state some of the evidence in order to elucidate this question. There are quite a number of letters and postal cards in the record, the originals of which accompany the record by order of the court. These postal cards on one side have the pictures of men and women in a more or less loving attitude towards each other stamped or printed upon them. None of them, however, reach the point of indecency. The nearest approach to this, among those with pictures upon them, is one showing a sailor kissing his sweetheart. Among the letters, however, is found the following:

"Trinity, Texas, August 7, '08.

"My Dear Mr. Smith:—

"No doubt you will be very much surprised to get this from *me*, as we have had such a short acquaintance, 'C'. But this is alright with

you, is it not? Say, 'Kid,' the meeting is still going on, and I haven't missed a service, and don't want to miss. I think I will join tonight, and I am sorry, as I have an engagement with you tomorrow night. I tell you what: I will go to church, and you be there, too, and we'll set together, and if you want to you may bring me back out here after church. I would enjoy the ride ever so much with you, 'C'. 'Kid,' have you noticed these pretty moonlight nights we are having now? And say, you know you love to ride in the moonlight with *a pretty little girlie* like '*me.*' Ha, ha! But I know one boy that says he doesn't like moonlight nights. He prefers *dark* ones. Well, I must stop and dress for church. You be sure and go tomorrow night.

> "*Yours* if you *desire*,
> "Mamie E."

In response to this invitation appellant went to Trinity on the evening of the 8th of August, and after church was over met prosecutrix in the house where the services were held and took her to his buggy with a view of driving her to her uncle's home, about two miles from the town of Trinity. The prosecutrix testifies that he drove out of town, and on and down the street until in front of Earl Cochran's house, a little ways from the church. He there put his arm around her, and she took his arm away, and told him to take it away, which he did, and they drove on. She states that she was willing to forgive him for that act, and they started toward home. Just before reaching Mr. Bell's house he hugged and kissed her again. This was a short ways from Mr. Bell's residence. She says her uncle was behind them going home that night. That it offended her when appellant hugged and kissed her; that she was sure it did. That she knew her uncle was behind them, because they left him back there. "I had not seen him pass us. There was not any other road for him to go. I knew that it was not but a little piece from Mr. Bell's. That was not the first time I had ever been kissed by a boy. At first it shocked me. It shocked me when he kissed me. It was unexpected. He hugged me and kissed me. I told him to quit. He quit. I took the lines and drove after that. He told me that he was going to smoke. I don't remember whether he asked me if I objected or not. He lit a cigarette. I was driving. He dropped his tobacco and got out after it. He picked it up. I waited for him, and I had the lines and waited for him. He got back in the buggy and went on. We did not have a lovable conversation. I enjoyed it from then on until we got to the forks of the road. This boy never was out there before in his life. He told me when we got in the buggy that I would have to show him the way. When we got to the forks of the road I told him that there was the turn in the road, and he took off this way from there, and said that he would turn around when he got ready. He did not take the lines away from me by force, but he took them. He got me off down there and turned around and stopped (meaning horses and buggy), and then he tried to have some familiarity

with my person. I knocked his hat out of the buggy. He went after it. He did not get out of the buggy after his hat, but he stepped down between the wheels. and got it, and that is t.ie reason that I didn't whip these horses and come home myself. I did not have the lines. They were wrapped around the whipstock. The reason that I did not grab those lines and hike out is because I couldn't. I was prostrated then. When he got out to get his hat, and threw the lines over the whipstock, I could not whip the horses and run over him. I can't drive a horse, and I couldn't run over him, and you know it. The reason I could not is because I couldn't. I was not afraid of turning the buggy over. I drove around the bad place in the road. Still I could not take the lines while he was out of the buggy and drive off and leave him. I asked him to take me home. He said 'alright,' and got mad at me. He got mad at me, and cursed like a sailor. He cursed me and said, 'God damn you, I will take you home.' We started off from there and went toward Mr. Standley's. I told him that was not the right way. I told him to let me put him in the right road, and he said, 'alright,' and he came back the way I told him to come. He came back by the curve and then he insulted me again. He stopped the buggy. He did not get out; he got down in the foot of the buggy at my knees. He put his hand on my legs. I did not scratch him up like a hyena had been hold of him. I was not awful particular not to scratch him. I did not have on my gloves; it was night. I did not knock his hat off during that fighting. His pistol was laying on the seat at that time. I saw the pistol when his hat fell off. He had it in his pocket and it fell out. The reason I did not pick up his pistol when it was on the buggy seat, and tell him to stand off or I would blow his brains out, is because I could not get to it; it was on the seat by him. I was on the seat, too. The pistol was lying there, but he was laying in my lap and I could not get the pistol. I was paralyzed and prostrate. He lay in my lap and insulted me with that pistol laying on the buggy seat. I could not pick it up and blow his brains out or I would. I did not know that I could pick up the pistol and run him off. He drove across the forks of the road, and he turned and come back. I told him to. He told me, 'By God,' he would take me home, and hit the horses lickety-brindle, and went sailing. He run those horses until he got in sight of the house, and until we could see the lights in my uncle's house, and I showed him the lights, and called his attention to the lights in my uncle's house. Right there and then he took me out and raped me. We never discussed what he was going to do before he took me out. I did not discuss anything that I would employ and use to prevent conception, but he discussed it. He said that he could use his handkerchief, or a cundrum, or I could use some medicine. He also said that he would not let anything go in me. He said that he would pull it out and not let anything go in me. I sat there and listened to that talk. I sat there in sight of the lights in my uncle's house. Following that he got out. He asked me if I was going to get out. He left the buggy right in the road. He tried to lift

me out of the buggy, and he couldn't, and he jerked me out. I seemed so heavy that he could not lift me out. I was pretty hard to pull out, because I was holding on mighty tight. At that time the buggy lines were wrapped around the whipstock. I don't remember where it was that my glasses fell off just prior to that. The first time that I remember of my glasses getting off was there at the last stopping place. I don't remember anything about the glasses. I don't remember anything about my glasses when I got out of the buggy. I first discovered my glasses before we got to the open place before we got to Uncle Will Davis.' I had them in my hand. I don't know whether I had them holding them during that time, or not. He came to the buggy and pulled me out, and I was pretty hard to pull out. His coat came off alright when he went to pull it off, and I don't know how it got loose. I was trying to get away all that time. He took his coat off and laid it down, and kicked it with his foot, and then he downed me on it. I was trying to get away all the time. He is a little man, but is larger than I am. After we got out down there he put his coat down, and put me down on it, and got on me. He put one elbow on my breast, and one knee shoved my legs apart. His hands were down there somewhere—just one hand. With the other hand—he had his elbow on my shoulder. When I hallooed he put one of his hands over my mouth. It sounded like I hallooed as loud as I could. I screamed out. I hallooed, and he put his hand over my mouth and told me to hush. I did not lay as still as a mouse. I did not halloo but one time, but I was struggling to get up. I lay down there. He got on me. After he got on me he did not tell me that he could not do anything. He kept on trying. He tried to tear me open with his fingers after he saw he could not do anything. I felt his fingers in me. He got up after he got through there and walked off a few steps away from there. He left me between him and the buggy. I did not lay there. I don't know whether he rolled a cigarette out there or not. He did not come back there smoking. He throwed me down there again. He got back down there and went through the same performance again. He had his hands on me again. The reason I did not halloo again is because I was not able to. I was laying there, and him on me, with his hands around me that way. I do not know whether or not that, while we were there, I stopped and said, 'Listen, I think I hear somebody coming.' I said that to scare him, and thought maybe that he would get up. He said, 'Lay back down, that is just my heart beating.' I remember telling him that I heard somebody coming, and said I did hear something. I heard some noise, and I supposed that it was somebody coming. If I swore that on the other trial it was the truth. It is the truth now. I told him that I thought that I heard somebody coming. I honestly believed at the time that I did hear somebody coming. He told me that it was his heart beating. When I got up he did not help me in the buggy. He just stood there. I got up and he put on his coat. He fixed up his

clothes, and fastened up his pants and suspenders, and got in the buggy. I was already in the buggy. I was sitting there with the lines around the whipstock. The horses were in the road and in sight of my uncle's home. The reason I did not halloo 'get up from here' (meaning to the horses) and go out from there is because the defendant was through then. When I got back in the buggy I was not afraid that I might conceive from what he had been doing, and get with child, but, of course, I thought that was what would happen, but that was not what I was scared about. When I got back in the buggy I did not ask him if he thought there was any danger. I am sure about that. I don't remember saying it. I don't remember asking him if he reckoned there was any danger from what we had been doing. When I was sitting in the buggy and he was fastening his clothes, he looked at me and said, 'You are the smallest made girl I ever saw, and you need not be uneasy; you will never be caught up with,' and I said, 'Do you reckon not?' I don't remember whether I told him, when I got back in the buggy, that my bracelet was gone, or not. I told him one time that night that the bracelet was gone. . . . I did not scratch him up any. The reason that I did not scratch him up like a dog was because he had me so I could not use my hands. I never did try to scratch him. I said on the other trial that the reason that I did not bite his hands was because I would not bite his old nasty fingers, but that was not the reason. The reason was because I did not have any chance to bite him. I said on the other trial I wouldn't bite his old dirty fingers. I could not tear his shirt or anything. Every time he got me in a helpless condition. He managed to do that alright. He seemed to be an expert, and seemed that he was used to doing such things, and knew how to go at it." This is some of the testimony bearing upon the transaction, as detailed by the prosecutrix. The appellant makes out a case of consent, and goes into the details. The letters and postal cards were introduced as bearing upon the question of consent, and explaining the reason why he was at the church and took the girl driving, especially the one quoted above. It is not the purpose of this opinion to go into a discussion of this testimony as to its sufficiency, but it is only mentioned, as before stated, as having a bearing upon the question of consent and force, either or both. The quoted charge singles out the one line of testimony, to wit, the postal cards and letters, and limits the force and effect of this testimony to the credibility of the prosecutrix and the probability of her consent, and especially withholds from the jury the right to consider this testimony in relation to the question of force. This charge can not be otherwise than a direct one on the weight of this testimony. For this reason the charge is erroneous. But if the court was authorized to charge upon the weight of this testimony from any standpoint, then its limitation is clearly erroneous. As these documents appear in the record, they pertain to the question of consent, and necessarily also to the question of force, as well as the credibility of the prosecutrix. If

the prosecutrix gave her consent, or her resistance was feigned, the facts would not constitute rape. But in reference to the question of the court withdrawing from the jury the right to consider this testimony as applicable to force, we are of opinion that this was clearly a charge upon the weight of evidence, and violative of the law from any standpoint. Rape under our statute, as applied to this particular case, is a criminal knowledge of a woman without her consent, obtained by force. If there was consent, then the force would make no difference. There must be a combination of force and the want of consent in order to constitute rape where force is the ground alleged. The appellant might use, or purpose to use, all necessary force, and to the extent of overcoming resistance on the part of the female, if she did resist, yet it would not be rape if she consented. So, in order to constitute rape by force, the two things must concur: first, force; second, want of consent. In reference to the question of necessary force, the statute provides, article 634 of the Penal Code: "The definition of 'force,' as applicable to assault and battery, applies also to the crime of rape, and it must have been such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties, and other circumstances of the case." Under this article of the Code it has been held, without interruption, that the force required is such as might be reasonably supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties, and other circumstances of the case. See White's Annotated Penal Code, section 1103, for collation of authorities. Something more than the mere want of the female's consent must be shown; there must have been resistance upon her part, dependent, of course, in amount on the circumstances surrounding her at the time, and on the relative strength of herself and the accused. Jenkins v. State, 1 Texas Crim. App., 346. It has been held that unfeigned, positive resistance, will show want of consent, and feigned resistance will not. Threats apart, every exertion in her power, under the circumstances of the particular case, must be made to prevent the crime, or consent will be presumed. Mooney v. State, 29 Texas Crim. App., 257; Rhea v. State, 30 Texas Crim. App., 483. The jury must believe from the evidence, beyond a reasonable doubt, that the accused intended to gratify his passions and have carnal intercourse with the prosecutrix, at all events, and notwithstanding resistance on her part. Porter v. State, 33 Texas Crim. Rep., 385. Now, under the law of rape, the question being force, it has been held that force, under the statute, is a criterion by which the question of consent is tested, and if no resistance to the carnal act is made by the female, the presumption obtains that she consented to the act. Mooney v. State, *supra.* The vice of the charge then, from these authorities, will be found in the limitation by the court of the evidence bearing upon consent as being inapplicable to the question of force. From these authorities it will be noticed that force and want of consent are both necessary ingredients of this crime, and

the evidence which shows consent necessarily tends to eliminate the question of criminal force. Mooney v. State, *supra,* has been followed as correctly stating the law. In fact, whether the Mooney case had ever been written, the statute makes it necessary that force and want of consent should be shown. The court, therefore, was in error in informing the jury that they might use the evidence of the letters and postal cards to show consent, and yet withdraw from them the right to consider the evidence in regard to bearing upon the issue of force.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

RAMSEY, Judge.—I concur in the opinion that the charge referred to and quoted is erroneous, and the error harmful and substantial. My concurrence goes only to the result.

BROOKS, Judge, absent.