las county, and of which W. H. Noble was foreman, and that appellant—

"did then and there take his corporeal oath and was duly sworn as a witness before said grand jury, said oath being then and there duly administered to him by the said foreman, who was then and there authorized by law to administer the same, and which said oath was then and there required by law, and was necessary for the ends of public justice, and was administered for the ends of public justice, whereupon it then and there became and was a material inquiry before said grand jury, and necessary for the due administration of the criminal laws of said state and for the ends of public justice, to wit:

"(1) Whether said W. D. Alt, in the city of Dallas, in Dallas county, Texas, on the 16th day of June, A. D. 1916, cashed a certain check for and signed by N. A. Dawson; said check being of the tenor following: 'No. 77. Stephenville, Texas, 6/16, 1916. 88–357. Cage & Crow, Bankers (Unincorporated): Pay to the order of W. D. Alt $100.00 one hundred & 00/100 dollars. Bexar Construction Co., Per N. A. Dawson. Cashed for NAD.'

"(2) Whether the said W. D. Alt in the month of July, 1916, presented said check hereinbefore described for payment to W. E. Crotty, assistant cashier of the Cage & Crow Bank, at Stephenville, Texas, and whether payment thereof was refused by said W. E. Crotty, assistant cashier, as aforesaid; and the said W. D. Alt did on the 27th day of September, A. D. 1917, in said county and state, before and to the said grand jury, under the sanction of said oath administered to him as aforesaid, deliberately and willfully state and testify in substance as follows, to wit:

"(1) That in the city of Dallas, in Dallas county, Texas, on the 16th day of June, A. D. 1916, he cashed said check hereinbefore described for said N. A. Dawson.

"(2) That some time during the month of July, 1916, he presented said check hereinbefore described for payment to W. E. Crotty, at the Cage & Crow Bank, at Stephenville, Texas, and that payment thereof was then and there refused by said W. E. Crotty."

The indictment, after charging that defendant testified to the truthfulness of both assignments, traverses the truth of both. The indictment was attacked on motion in arrest of judgment, by general demurrer, and specific exceptions. It is contended the indictment does not show a violation of the criminal laws in the matters stated, and that there is no allegation that the grand jury was examining into any particular matter which constituted an offense, nor was that body inquiring of defendant in general terms whether he had knowledge of the violation of any penal offense, or that any questions were asked defendant in regard thereto. The further contention is made that there is no allegation sufficiently showing the materiality of the statement to any matter about which the grand jury was authorized by law to act or investigate. There is no allegation to show they were inquiring about any particular violation of the law, or in general terms whether he had knowledge of any violation of the law. This indictment fails to allege sufficient facts to show the materiality of the testimony about which inquiry was being made. It does allege that appellant testified that he had cashed a check drawn in his favor by N. A. Dawson, who purported to represent a construction company, which check is alleged to have been given in June, and he testified that in July he presented it to a bank in Stephenville, Erath county, for payment, which payment was refused. These matters are alleged to be false. Appellant swore they were true.

[2] There is nothing alleged to show how these matters became, or could become, a matter for investigation by the grand jury from a criminal standpoint. The grand jury would have no right to inquire into other matters than violations of the penal law. It is not alleged that this testimony was given in regard to any matter criminal, nor does it allege any fact that would show that it related to any criminal offense. The grand jury is only empowered to inquire into violations of criminal laws of Texas. Upon this subject we cite Gallegos v. State, 50 Tex. Cr. R. 191, 95 S. W. 123; Pigg v. State, 71 Tex. Cr. R. 600, 160 S. W. 691; Scott v. State, 72 Tex. Cr. R. 26, 160 S. W. 960; Higgins v. State, 38 Tex. Cr. R. 539, 43 S. W. 1012; Weaver v. State, 34 Tex. Cr. R. 554, 31 S. W. 400. Neither allegation in the indictment shows even indirectly that it was a violation of any criminal law; that is, either to pay the check or to present it to the bank in Erath county for payment and its refusal. Without in some way showing that these allegations could form the basis of a criminal prosecution which would form the subject of an inquiry by the grand jury, that body would have no right to inquire into it.

There are other matters in the case that might be of importance, presented by bills of exception to charges asked and refused, and to the introduction of evidence; but as the matter is presented we will not discuss them.

The judgment will be reversed, and the prosecution ordered dismissed.

---

## WOODS v. STATE.   (No. 4849.)

(Court of Criminal Appeals of Texas.   May 1, 1918.)

1. CRIMINAL LAW ☞609 — CONTINUANCE — HEARING.

Although, under Code Cr. Proc. 1911, arts. 612, 613, upon application for continuance, the state may controvert and the court determine accused's diligence, it is not within the court's province on such hearing to pass upon the weight of the evidence accused desires from an absent witness.

2. CRIMINAL LAW ☞959 — NEW TRIAL — HEARING.

The probable truth of testimony of an absent witness may be looked into on motion for new trial, in connection with evidence adduced upon the trial.

3. CRIMINAL LAW ☞595(3)—CONTINUANCE—TESTIMONY OF ABSENT WITNESS.

In rape trial, continuance asked to secure testimony of absent witness that prosecutrix had taken a man into her room was improperly refused.

**4. RAPE ☞57(1)—QUESTIONS FOR JURY.**

In view of Pen. Code 1911, art. 1064, defining force, and article 1065, defining threat, as applicable to rape, evidence in rape trial *held* not to justify taking it away from the jury.

**5. RAPE ☞40(1)—REPUTATION OF PROSECUTRIX.**

Accused's defense in his trial for rape, asserting that prosecutrix had intercourse with another person on the night in question and not with accused, was sufficient to justify introduction by the state of evidence supporting the general reputation of prosecutrix for chastity.

**6. WITNESSES ☞344(2) — IMPEACHMENT — CHASTITY.**

In rape trial, accused's wife, testifying for him, could not be impeached by evidence that she and accused were married after birth of one or more of their children; it being immaterial.

Appeal from Criminal District Court, Tarrant County; Bruce Young, Special Judge.

Joe Woods was convicted of rape, and appeals. Reversed.

John L. Poulter, of Ft. Worth, for appellant. E. B. Hendricks, Asst. Atty. Gen., for the State.

MORROW, J. This trial was under an indictment for rape charging its accomplishment by force, threats, and fraud upon the person of Ethel Henley. The punishment was fixed at imprisonment for life.

The injured party was a young girl who had been in the habit of working for something like a year, and did not live with her family, and at the time of the alleged offense was doing housework for the appellant, who was a barber, and whose family consisted of his wife and children. After prosecutrix was employed appellant bought her some clothes. The house in which they lived contained about six or seven rooms. The injured party slept in a room adjoining that occupied by appellant and his wife. Her testimony shows that appellant came into her room about 12 o'clock at night. She was awakened by his entering the room and she screamed, and he sat down upon the bed and asked if she was scared. She told him to leave her alone, that she was sleepy, and turned her back on him, and he asked her to turn over and talk to him, that he would not bother her. She did not turn over at that time, but later he took hold of her arm and she did turn over. He laid by her a few minutes and put his arm across her breast. She said:

"I tried to get away from him—and he told me if I hollered or made a racket he would kill me, and he got up and went in the other room and came back. His wife came in directly after he came in; he got her to come in there. I was crying after he told me he would kill me, and I had him call her. She told me I had it all to go through with any way and I might as well go on then. He asked her if she cared and she said no she didn't care. She sat there on the bed a few minutes and talked and then got up and left. He then pulled off all his clothes and had intercourse with me. He forced me to. I was still crying. I did not consent to it. I asked him to go and leave me alone; that I

didn't want to do wrong. I asked him to go away several times. My limbs were together and he taken his hands and forced them open."

She complained that it was painful, and after he got through he went into the other room and came back, and she asked him for a drink of water. He said he would go and break some ice, and while he was gone she grabbed her clothes and ran, going to a restaurant, and reported the rape. She said she had a sweetheart, and that she talked to him at the gate on the evening before the incident happened. She said that her sweetheart Carson talked to her at the gate, but did not come in the house. Cross-examined she said that she screamed before she knew who it was in the room; that she did not get out of bed; that she could see who it was by the moonlight; that she did not call any one at first; later called Mrs. Woods; that she made no effort to get out of bed; that she knew Mrs. Woods and the two children were in the adjoining room; that she did not call Mrs. Woods, but had the appellant do so; that before Mrs. Woods came she told appellant she did not want to make any trouble between him and his wife, and he said he would call his wife; "I went to crying and he told me if I cried any more he would kill me;" that the reason she wanted him to call Mrs. Woods was she thought maybe she would make him go out. She says she was wearing a nightgown and drawers, and that she unbuttoned the drawers because he threatened her and told her to unbutton them. He told her if she did not do it he would kill her. He was in bed some five or ten minutes before doing anything, just loving her while he lay there. "He just told me if I didn't do what he wanted me to do he would kill me, while he was lying there loving me." He went out of the room and came back and she saw something in his pocket that resembled a razor. She did not try to get away while he was gone; was afraid to; "didn't make any effort to leave while he was gone; I was afraid he would try to kill me. We didn't do any tussling or fighting there on the bed before I unbuttoned my drawers, it was after they were unfastened. The only force he used was to pull one of my legs over, and he forced me to do it. He started to lay my leg over and I tried to keep him from opening my leg. I did not try to get out of the bed. I tried to get him out. I took my hands and tried to push him off. My room is right next to the jail building within a very few feet of it, but I was afraid to holler or say anything. I knew there were men guarding the jail and I knew there was another house on the other side right close to ours with a number of people sleeping in it. I did not try to attract the attention of anybody. I just tried that is all. When he was taking his clothes off I wasn't doing anything but just laying there. When Mrs. Woods went out of the room I

did not try to go out with her or stay with her for I was afraid of him." She said she believed that appellant would carry out his threat.

Appellant's wife testified that appellant came home about 5:30 o'clock in the evening, and went back to work, returning about 9 o'clock, his usual hour; that Ethel ate no supper, but during that meal was in the front room talking to a man whom she said was named Carson, and part of the time talked to him at the gate. Witness claims to have invited both of them to supper, and after appellant left Ethel and Carson went into Ethel's room; that Ethel did not wash dishes, which was her duty; that she remained in her room with Carson until about 9:30 or 10 o'clock. Witness said while she was attending to her children about the house she noticed Ethel's door closed and tried to open it and found it locked; that she looked in at the window and saw Ethel and Carson on the bed together in the act of intercourse. She further testified that she became angry and after the man had gone told Ethel she must leave the house the next morning; that Ethel began crying and was crying when appellant came home, and appeared very angry. After appellant came home she began to wash the dishes. Witness claims to have gone to bed with appellant about 10:30 or 11 o'clock; that there were two babies in the room and one of them was sick; that she was not in a good humor and did not go to sleep before the officers came in; and that she knew her husband did not leave the room before that time; that about 30 minutes before that time she heard the gate slam. She claims to have made a statement to the officers the morning after the arrest of appellant in accord with that testified to on the trial.

Several persons testified that they lived near by and heard no disturbance. The keeper of the restaurant testified that the girl came to the restaurant, first to the window, and called for help. She was crying and without shoes. She could not tell anything. "He tried to kill me," is all she said. An officer was called. She had her dress in her hand, and said the man tried to kill her. "If I didn't do this, he tried to kill me." She said he had a razor. The county physician made an examination of the girl and testified that in his opinion from the appearance of the vagina she had had intercourse with some one. That she was quite nervous. That the hymen was entirely gone. "That if the hymen had been penetrated that night fragment edges of the ruptured hymen would still be showing there; I think it would, undisputably, but I didn't notice anything like that in this girl. The hymen disappears from different sources. The hymen could have entirely disappeared in an entirely virtuous girl. The absence of the hymen is not of itself necessarily an indication of a lack of virtue."

That he was unable to tell how long the hymen had been gone.

Appellant made an application for a continuance on account of the absence of Mrs. Harret Bryan. This witness resided in Tarrant county, and a subpœna was issued for her a few days after the indictment was found. The indictment was filed the 8th of August, and the trial begun the 20th of August. The absence of the witness was accounted for by the statement that she was secreting herself to avoid service, but that her absence was temporary, and her testimony could be obtained by a continuance or postponement. By her he expected to prove that she saw the injured party, Ethel Henley, go out into the street, hail a man who was passing, and take him into the room she occupied; that the witness did not know the man; that he remained for some time and did not leave until late that night. The state controverted the motion by affidavit of a witness who claimed that she (Mrs. Harret Bryan) lived near the residence of appellant, and that the affiant had several conversations with her concerning the injured party (Ethel Henley), in one of which Mrs. Bryan had said that she had seen a man standing with the girl at the gate of the house which was occupied by appellant, and later they went in the house together, and the man in a few minutes came out and went away, and some time after that had talked with Mrs. Bryan again and that Mrs. Bryan said she was mistaken about the matter.

[1] This was the first application for a continuance. There was no contest of the diligence. The court qualifying the bill says that the affidavit mentioned above was presented and considered by him along with the application for a continuance, "and the application was thereupon overruled. We understand from the record that the court was influenced to make the order refusing to continue the case by the affidavit mentioned. The effect of the affidavit controverting the motion was to cast doubt upon the truth of the testimony of the absent witness by reason of her having made alleged contradictory statements with reference to the matter. The state was privileged under article 611 to have controverted under oath the diligence set up in the application, and the court might have inquired into the question of diligence thus raised. Articles 612 and 613, C. C. P.; Howard v. State, 8 Tex. App. 53; Hardin v. State, 40 Tex. Cr. R. 208, 49 S. W. 607; Attaway v. State, 31 Tex. App. 475, 20 S. W. 925; Lane v. State, 28 S. W. 202. The diligence being sufficient, however, it was not within the province of the court on the hearing on the application for a continuance to pass upon the weight of the evidence which appellant desired from the absent witness.

[2] The probable truth of the testimony of the absent witness may be looked into on motion for new trial in connection with the

evidence adduced upon the trial. Steel v. State, 55 Tex. Cr. R. 551, 117 S. W. 850, and cases cited. The case of Roquemore v. State, 54 Tex. Cr. R. 593, 114 S. W. 140, is on the facts touching the application for continuance quite similar to this. From it we take the following quotation:

"The state contested said application, not on the ground of want of diligence, but on the ground that the testimony of said witnesses is not probably true. * * * We are of opinion that the court would not · be authorized, in passing upon an application for continuance, to pass upon the truth of what a witness would testify to on the trial by proving contradictory statements by witnesses. The law of Texas has wisely left the trial of all issues of fact as well as the credibility of the witnesses to a jury, and this court is of opinion that this province of a jury cannot be invaded by the court, and would be establishing a precedent that would ultimately result in confusion and a state of affairs that could not be easily remedied. The application for continuance, we think, shows proper diligence."

[3] If appellant could prove by Mrs. Bryan, as he claims in his motion, that she had seen a man go into the house with Ethel Henley and go into her room, it would have been a material fact. Ethel Henley denied that this occurred, and Mrs. Woods affirmed that it took place, and circumstantially that the man Carson had intercourse with the girl on the night of the alleged offense. The fact shown in the affidavit attached to the motion that Mrs. Bryan had afterwards retracted her statement, or changed it, would have gone to the weight of her evidence and to the credibility. The state used as evidence against appellant the fact that some one had had intercourse with the girl on the night in question, and counsel for appellant earnestly insists that the state's evidence fails to meet the measure of the law in the prosecution for rape by force, threats, and fraud, in that there was no fraud practiced, and that the failure to make outcry and the extent of the resistance are not sufficient, citing several cases, as follows: Perez v. State, 50 Tex. Cr. R. 34, 94 S. W. 1036; Arnett v. State, 40 Tex. Cr. R. 617, 51 S. W. 385; Elliott v. State, 49 Tex. Cr. R. 435, 93 S. W. 742; Smith v. State, 56 Tex. Cr. R. 316, 120 S. W. 188; Mooney v. State, 29 Tex. App. 257, 15 S. W. 724; Rhea v. State, 30 Tex. App. 483, 17 S. W. 931; Price v. State, 36 Tex. Cr. R. 143, 35 S. W. 988; Cox v. State, 44 S. W. 157; Rhem v. State, 29 Tex. App. 509, 16 S. W. 338; Rice v. State, 37 Tex. Cr. R. 38, 38 S. W. 801.

[4] Our statute (article 1064, P. C.) defines force, and article 1065, P. C. defines threat, as applicable to this offense. The rule seems to be that where, as in this instance, threats and force are charged in the indictment, and there is evidence of each, it is not necessary that either the force or threats alone measure up to the standard of the statutory definition. The cogency which one contributes to the other may be sufficient to constitute all that is required. That is Mr. Branch's conclusion from the decisions. Branch's Ann. P. C. § 1782. It is the rule recognized in some of the authorities mentioned by appellant, notably Perez v. State, 50 Tex. Cr. R. 34, 94 S. W. 1036. See, also, Cole v. State, 57 Tex. Cr. R. 51, 123 S. W. 409, 136 Am. St. Rep. 973; Sharp v. State, 15 Tex. App. 185; Sawyer v. State, 39 Tex. Cr. R. 557, 47 S. W. 650. Under the facts and this rule we do not think that the evidence was such as to justify the court in taking it away from the jury.

[5] The appellant's defense, asserting that the injured party had intercourse with another person on the night in question and not with appellant, was, we think, sufficient under the authorities to justify the introduction by the state of evidence supporting the general reputation of the prosecuting witness for chastity. Jacobs v. State, 66 Tex. Cr. R. 146, 146 S. W. 558.

[6] The state undertook to lay a predicate on cross-examination of appellant's wife to show that appellant and his wife were married after the birth of one or more of their children. We think that such impeachment of her would have been on an immaterial issue, and one which would have been inadmissible and harmful to appellant, in that it would have tended to burden his case with evidence that he and his wife had lived in adultery before their marriage, a criminal offense in no way connected with that under consideration. This matter as presented in the bill does not make it clear that the impeachment took place.

The assignments of error not discussed have been examined, and, we think, present no reversible error. The evidence adduced and the nature of the case are such that, in our opinion, the error committed by the trial court in refusing to continue or postpone the case for the purpose of permitting appellant to obtain the testimony of Mrs. Bryan was material, and requires a reversal of the judgment; which is ordered.

---

### SORIA v. STATE. (No. 5007.)

(Court of Criminal Appeals of Texas. May 1, 1918.)

1. HOMICIDE ⬤⟲100—ASSAULT TO MURDER—PRINCIPAL.

If, after accused cut prosecutor, accused's brother shot prosecutor to defend accused from attack apparently about to be made by prosecutor, the brother not knowing of the original difficulty and coming upon accused and prosecutor and finding them in controversy, accused would be responsible as principal only for the cutting, and not for the shooting.

2. CRIMINAL LAW ⬤⟲775(2)—ALIBI—INSTRUCTIONS.

In trial for assault to murder, evidence held to require instruction on alibi.

3. CRIMINAL LAW ⬤⟲775(3)—ALIBI—INSTRUCTIONS.

In trial for assault to murder, an instruction that, if the evidence raises or leaves a reason-